**LAKESIDE MERCY HOSPITAL, INC., Plaintiff,**

v.

**INDIANA STATE BOARD OF HEALTH et al., Defendants.**

**Civ. No. F 75–68.**

United States District Court, N. D. Indiana, Fort Wayne Division.

Feb. 10, 1976.

Charles W. Linder, Jr., Indianapolis, Ind., Arthur Wright, Fort Wayne, Ind., for plaintiff.

P. Michael Miller, David Stewart, Fort Wayne, Ind., for defendants.

## MEMORANDUM OF DECISION AND ORDER

ESCHBACH, District Judge.

This case is before the court on motions by each of the defendants to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted, Rules 12(b)(1) and (6), Fed.R.Civ.P.,[1] and upon plaintiff's cross-motion for summary judgment, Rule 56, Fed.R.Civ.P. Defendants have submitted affidavits and other documentation in connection with their respective motions, such that the court may now treat these motions, where they rest on Rule 12(b)(6), as seeking relief under Rule 56. *See* Rule 12(b), Fed.R.Civ.P.[2]

The facts, although complicated, are not in dispute. Plaintiff is a not-for-profit organization incorporated under the laws of Indiana seeking to build and operate a hospital in the vicinity of Fort Wayne, Indiana. The controversy in this case arises over the procedures whereby the promoters of a proposed hospital (or the owners of an existing hospital) may recoup their capital expenditures in part by federal repayments made under various federal health programs, in particular Medicare/Medicaid.

In this suit plaintiff seeks a declaratory judgment under 28 U.S.C.A. §§ 2201–02 that its proposed capital expenditures are eligible for consideration by the Secretary of Health, Education and Welfare, pursuant to Section 1122 of the Social Security Act (42 U.S.C.A. § 1320a–1), and to compel the Secretary to consider and act upon their application. Jurisdiction is said to lie under 28 U.S.C.A. §§ 1331, 1343(3), 1343(4), 1361, and 2201–02. Plaintiff's claim is that the defendants in various ways have failed to follow the procedures required by 42 U.S.C.A. § 1320a–1, and have deprived plaintiff of due process of law and the equal protection of the laws in contravention of the Fourteenth Amendment.[3]

The purpose and operation of Section 1320a–1 can best be understood in the context of other federal provisions supporting hospital construction. Probably the oldest and best known program in this area is the "Hill-Burton" program, which channels federal funds to the states to support construction and modernization of hospitals and other medical facilities. Under this Act (Public Health Service Act § 600 *et seq.*, 42 U.S.C.A. § 291 *et seq.*) a participating state submits a state plan to the Secretary, updated annually, which designates a particular state agency to administer the Hill-Burton program within that state, to determine need for new or expanded hospital facilities, and to submit recommendations to the Secretary whenever an applicant submits proposals for new capital expenditures. Of course, an applicant may build a hospital

---

1. Motion under 12(b)(1) by Parkview incorporated with its answer, Aug. 8, 1975, with brief; motion under 12(b)(1) by St. Joseph incorporated with answer, without brief, Aug. 11, 1975; motion under 12(b)(1) and 12(b)(6) by the Secretary, incorporated with its answer of Aug. 12, 1975 with brief, joined in by the ISBH and Parkview, Sept. 8, 1975, with separate briefs; motion under 12(b)(1) and 12(b)(6) by the ISBH incorporated in its answer, Aug. 13, 1975, without brief. Motions originally submitted without briefs have now been so supported, pursuant to local rule 7(b).

2. Plaintiff objects to the automatic treatment of the 12(b)(6) motion as a motion for summary judgment. However, this procedure is so well established that plaintiff cannot now claim surprise.

3. Presumably, plaintiff's due process claim against the federal officials rests upon the Fifth Amendment.

notwithstanding disapproval by the Hill-Burton state agency; the applicant cannot hope, however, to be reimbursed by the federal government.

Similar administrative machinery is established for the Comprehensive Health Planning Program under the Public Health Service Act § 314(a), 42 U.S.C.A. § 246. Here federal funds are channeled to states which submit and have approved by the Secretary a state plan for Comprehensive Health Planning. Again, there is a state agency designated as the agent of the Secretary for purposes of screening applications to verify conformity under the approved state plan.[4]

Until the enactment of 42 U.S.C.A. § 1320a–1, the repayment provisions of Medicare/Medicaid and other direct payment provisions supported by federal funds did not take into consideration whether the participating hospitals' facilities had been constructed in accordance with the various state plans relevant to Hill-Burton and other programs. Since Medicare/Medicaid would pay a hospital's "reasonable costs," and since depreciation, debt service, and other capital-related costs could reasonably be apportioned to the fee structure, a hospital could circumvent the Hill-Burton requirements and still recover from the federal government a substantial part of its initial capital expenditure. Thus the federal government would be subsidizing the construction of hospitals which, under Hill-Burton, had been determined to be unnecessary for appropriate delivery of health services in the area and thus were to be discouraged.

In 1972, Congress enacted Section 1320a–1 (Social Security Act § 1122) to remedy this situation. Under this section, the Secretary is empowered to enter into agreements with the Governors of the various states, whereby a state agency will be appointed as a designated planning agency for 1320a–1 approval. The state agency is to develop a state plan for determining the necessity and evaluation of proposed capital expenditures, with the approval of the Secretary, and thereafter to screen and make recommendations on individual proposals for capital expenditures submitted by proposed or existing hospitals within the state. The procedures by which the state agency is to pass upon individual applications are, under the agreement between the Governor and the Secretary, to be made in conformity with the regulations promulgated by the Secretary and in conformity with the Act (42 U.S.C.A. § 1320a–1). Unless the Secretary determines otherwise, or unless the state agency rejects the proposed expenditure, the Secretary is to approve the capital expenditure for purposes of reimbursing, by way of Medicare/Medicaid payments, the portion of the fees allocable to return of depreciation, debt service, and other capital-related expenditures. If the state agency disapproves the expenditure, an appeal to the Secretary will lie; the Secretary's final determination is not reviewable in court. 42 U.S.C.A. § 1320a–1.

The State of Indiana has entered into an agreement with the Secretary pursuant to Section 1320a–1. By that agreement the Indiana State Board of Health (hereinafter ISBH) is named the Secretary's "Designated Planning Agency" pursuant to the Act. As more fully explained below, plaintiff's claim is that by operation of law the ISBH should be deemed to have approved its application for capital expenditures under the Act, such that the Secretary should now be compelled to accept or deny the application. The ISBH, joined by the Secretary, contends that the application has in fact been properly rejected as a matter of law, such that there is no application upon which the Secretary can act. The consequences to plaintiff, if it is correct, are that the Secretary would thereupon pass upon plaintiff's application, and, if approved, plaintiff would be eligible for federal repayment of that portion of the Medicare/Medicaid bills it forwards to the Government as can be

4. Hill-Burton and Section 314(a) and (b) programs have recently been consolidated. *See* Public Law 93–641 (1975).

ascribed to a return of its capital expenditure and debt service. If defendants are correct, plaintiff may nonetheless build its hospital, but when it submits its Medicare/Medicaid bills for payment by the Government the Secretary will disallow that portion of the bills that represents a return of capital expenditure by depreciation or otherwise.

Plaintiff's application for approval of proposed capital expenditures had its genesis in a decision in 1973 by state health authorities that additional hospital beds were needed in the Fort Wayne area. By 1973, the ISBH had concluded that existing facilities were inadequate and that proposals for adding 172 beds should be entertained. The groundwork was then laid for amending the state's Hill-Burton plan to reflect this new need, such that the approved construction plan, whether in the form of a new hospital or as additions to existing hospitals, could qualify for Hill-Burton funds. A similar plan was proposed for the state's Section 1320a–1 plan.

Responding to these developments, two competing groups of interested individuals formed corporations for the purpose of constructing and operating a hospital to fill the need. The first to complete and submit its proposal, Community Hospital of Fort Wayne, sought a 156-bed facility. Although the Community Hospital proposal was generally approved by regional authority, the ISBH rejected the proposal on July 5, 1974, since at that time the Secretary had not yet approved the ISBH's proposed amended state plan whereby a new hospital could qualify for Hill-Burton funds.[5]

After a rehearing and appeal had failed, Community Hospital sought review of the ISBH decision in Allen Circuit Court, Allen County, Indiana. At the time it sought this judicial review, Lakeside Mercy (the competing group) had completed and submitted to the ISBH its own proposal for a new hospital. After the case had been venued to Wells County Circuit Court, Community Hospital moved for and received a temporary restraining order (December 9, 1974) and thereafter a preliminary injunction (December 31, 1974) whereby the ISBH was prohibited from acting on any competing proposal for health facilities in the Fort Wayne area during the pendency of the suit. In this way, should Community's petition for review be granted, and if it was found that the ISBH should have approved the application, the issue would not have been rendered moot by the action of the ISBH on a competing application. The ISBH interpreted the court's orders to apply to Lakeside Mercy's proposal, and thereafter refused to process the application. Lakeside was not made a party to the proceedings in Wells County Circuit Court, nor did it attempt to intervene in those proceedings.

The three existing Fort Wayne hospitals did, however, intervene in that suit. Their interests were thereafter protected when the state court dismissed the complaint on May 27, 1975, inter alia on the grounds that it had no jurisdiction under the Indiana Administrative Adjudication Act to review the actions of the ISBH where, as here, it was acting as an agency of the federal government. In the order of dismissal, however, the court enjoined the ISBH from further acting on any competing proposal until the existing hospitals submitted through channels their own plan for meeting the 172-bed need in the Fort Wayne area by adding new beds to their own facilities. The proposals of Parkview, Lutheran and St. Joseph Hospitals (the three existing hospitals) were received by the ISBH June 30, 1975, whereupon the ISBH renewed its active consideration of Lakeside Mercy's proposal. On July 9, 1975, the ISBH disapproved the Lakeside Mercy proposal, in part because the proposed rate structures were not found to be economically feasible. On the same day it approved the joint application of the existing hospitals and forwarded its recommendations to the Secretary.

Plaintiff does not directly challenge the grounds upon which the ISBH rejected its

---

5. At that time, the Hill-Burton plan called for three hospitals in the Fort Wayne area, an allocation already filled. The amended plan, since approved, calls for a fourth hospital.

applications; hence, it does not seek the traditional form of judicial review of agency decisionmaking. Rather, it proposes two challenges of a different nature: First, that by the time the ISBH purported to rule on Lakeside Mercy's proposal, the proposal had already been accepted as a matter of law; and second, that the ISBH involved itself in encouraging the three existing hospitals to submit a competing bid in competition with plaintiff. In the latter regard, Lakeside urges that the Wells Circuit Court order holding in abeyance ISBH consideration of Lakeside's proposal until the three existing hospitals could submit a bid of their own was entered into collusively, and that by virtue of many meetings and telephone conversations between the ISBH and the three hospitals, the ISBH actively solicited and encouraged a competing bid such that Lakeside's application could be rejected, yet the health needs of Fort Wayne could be adequately met.

Lakeside does not contend that the approved proposal of the three hospitals does not in fact conform to the state plan or the Act and regulations thereunder. Nor does it challenge the adverse determination of the ISBH in its own application, other than its assertion that by that time the ISBH was supposedly without power to make a negative recommendation.

Plaintiff's challenge to the ISBH's authority to make a negative recommendation rests upon the provisions of 42 U.S.C.A. § 1320a–1(d)(1)(B)(i), the implementing regulation 42 C.F.R. § 100.106(a)(4) (1974), and the agreement between the Secretary and the State of Indiana whereby Indiana chose to participate in the 1320a–1 program.[6]

Title 42 U.S.C.A. § 1320a–1(d)(1)(B)(i) provides in relevant part that the Secretary shall disallow capital expenditure recoupment if the state designated planning agency has rejected the proposal "within a reasonable period after receiving [notice of an intended expenditure]." Stated another way, the Secretary shall take up the proposal for consideration if the state agency has unreasonably delayed its decision. The Secretary's regulations implement this provision by requiring that: "The failure of the designated planning agency to provide any [notification of rejection] within the time limitations set forth above shall have the effect of a [favorable] determination. . . . ." 42 C.F.R. § 100.106(a)(4) (1974). Thus, if within the time period required by the regulations[7] the ISBH does not disapprove the capital expenditure, the proposal is deemed approved, and must be accepted by the Secretary for consideration.

Under the practice of the ISBH, followed by counsel in this case, the running of this period during which the ISBH must rule is generally referred to as the "time clock." The status of applications before the ISBH is always described according to the number of days remaining on their time clock. It is Lakeside's contention that its time clock had run prior to the ISBH determination adverse to it on July 9, such that a declaratory judgment should issue declaring the status of its application to be that it stands approved by operation of law. It is conceded by all that on December 9, 1974 there was still time on Lakeside's time clock; that if the injunction of the Wells Circuit Court entered that day was effective to

---

**6.** It appears that by inadvertence the agreement reached between the Secretary and the State of Indiana omitted the relevant language of 42 C.F.R. § 100.106(a)(4) upon which plaintiff relies. All parties concede that this provision should have been made part of the agreement, and that it is binding on the State as though it had been made part of the agreement. Part of the relief plaintiff seeks is a declaration under 28 U.S.C.A. §§ 2201–02 that the provision is binding upon the State of Indiana and the ISBH, and to this extent plaintiff is entitled to relief.

**7.** The precise number of days in which the ISBH must act will vary according to the imminence of the proposed capital expenditure, see 42 C.F.R. §§ 100.106(a)(1), (a)(4), and according to interim agency actions taken with regard to the application, see 42 C.F.R. § 100.-106(a)(3). In any event, the period will be between 60 and 90 days. In this case, although it is unclear how many days plaintiff may initially have had, it is stipulated by all that on December 5, 1974 the ISBH had 19 days remaining in which to consider plaintiff's application.

stop the running of the clock, and if the order of May 27, 1975 continuing the injunction until the new proposals were received was effective to stop the clock, then the ISBH acted within the remaining time when it determined Lakeside's application on July 9, but that if either injunction was ineffective to stop the clock, then the automatic approval of Lakeside's application should be found as a matter of law. It should be noted that although 42 U.S.C.A. § 1320a–1(d)(2) allows the Secretary to reject a negative finding of the state designated planning agency, the provisions of Section 1320a–1(d)(1) require that except where the planning agency had not received adequate notice, or except where the planning agency has issued a negative recommendation, the Secretary "*shall*" allow the recoupment of capital expenditures.

The refusal of the ISBH and the Secretary to proceed upon its recommendations constitutes, according to plaintiff, a violation of the Act and the Secretary's own regulations thereunder, denies plaintiff due process of law, and denies it the equal protection of the laws. The activities of the ISBH in conjunction with the proposals of Lutheran, Parkview, and St. Joseph Hospitals are likewise alleged to be in violation of statutory and constitutional mandates. Plaintiff therefore alleges in its complaint a cause of action arising under 42 U.S.C.A. § 1320a–1, 42 U.S.C.A. § 1983, 42 C.F.R. § 100.106 (1974), the Fourteenth and presumably also the Fifth Amendments to the Constitution.

### Jurisdiction

As jurisdictional bases for its statutory and constitutional claims, plaintiff seeks to rely upon the provisions of 28 U.S.C.A. §§ 1331 (federal question), 1343(3) and (4) (civil rights), 1361 (mandamus), and 2201–02 (declaratory relief).

Title 28 U.S.C.A. § 1331 provides for jurisdiction where "the amount in controversy" exceeds the statutory amount of $10,000 and the dispute is one "aris[ing] under the Constitution, laws, or treaties of the United States." Defendants assert that neither the proper amount in controversy nor a real federal question is present in this case.

■ The "matter in controversy" the value of which must exceed $10,000 must be shown by plaintiff's complaint as aided by the documents submitted in opposition to the motion to dismiss. The issue in controversy is plaintiff's right to participate in a federal program of reimbursement of expenditures. Defendants join in the assertion that the amount in controversy is the value of the right to be free of the Secretary's regulations which are imposed on a hospital once it receives federal funds. Of course, it should be noted that plaintiff is actively seeking to come under these regulations. Plaintiff responds that the value in controversy is the cost of the hospital to be built. Defendants rightly point out that whether or not plaintiff succeeds on the merits it can build its hospital.

■ In determining whether there is the requisite amount in controversy to found jurisdiction on 28 U.S.C.A. § 1331, the burden is on the plaintiff to allege and prove each jurisdictional fact, even where the challenge to the court's jurisdiction has been suggested by the defendant. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Where the claim is for money damages, the court's role is to ascertain whether there is "a legal certainty that the claim is really for less than the jurisdictional amount" upon defendant's motion for dismissal. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). But where, as here, the suit is not for damages, the motion to dismiss "calls for substantial proof on the part of the [plaintiff] of facts justifying the conclusion that the action involves 'value' in the necessary amount. . . . And the existence of such 'value' is to be measured by that which the [plaintiff] seek[s] to gain by [its] action—the pecuniary consequences to [it]." *Breault v. Feigenholtz*, 380 F.2d 90, 92 (7th Cir. 1967), *cert. denied*, 389 U.S. 1014, 88 S.Ct. 591, 19 L.Ed.2d 660 (1967). It will not defeat jurisdiction even if this "value" is only potential or contingent. *See*

*Sears, Roebuck & Co. v. American Mut. Liab. Ins. Co.*, 372 F.2d 435 (7th Cir. 1967). The question is one of probabilities, and plaintiff must show that the pecuniary consequences to it probably exceed the jurisdictional amount. *See Jeffries v. Silvercup Bakers, Inc.*, 434 F.2d 310, 311–12 (7th Cir. 1970).

■ The pecuniary consequence to plaintiff in this suit for declaratory judgment is its eligibility for federal funds by way of reimbursement for approved capital expenditures. If plaintiff is successful on the merits, and if the Secretary thereafter approves the application, plaintiff will be entitled to a substantial claim for federal funds when it submits its Medicare/Medicaid bills for repayment. If plaintiff is unsuccessful, and if it nonetheless proceeds to build its hospital, it must forgo its claim under Medicare/Medicaid for that portion of its billings which are allocable to capital-related expenses and depreciation. It is immaterial that the amount is contingent on the hospital actually being built, and on the Secretary's ultimate approval, for without a determination that plaintiff's application should be deemed approved as a matter of law, there is no application before the Secretary upon which he can act.

The amounts which plaintiff would probably receive under the maternal and infant care program (42 U.S.C.A. §§ 701–16), under the provisions for the aged and disabled (42 U.S.C.A. §§ 1395–1395pp), and under Medicare/Medicaid (42 U.S.C.A. §§ 1396–1396i) are dependent upon so many variables that precise computation is impossible. Despite this, there is a virtual certainty that the reimbursable return of depreciation and other capital-related expenses would exceed $10,000. Although the proposed capital outlay which Lakeside would undertake has not yet been reduced to a sum certain, plaintiff's estimate of a capital expenditure in excess of $3,000,000 appears to be reasonable. By way of comparison, the competing proposal by the existing hospitals calls for capital expenditures in excess of $18,000,000 to meet the same bed requirements.

If this expenditure is approved, plaintiff will be able to recoup a share of the depreciation of the hospital over its useful life; that is, some share of the entire $3,000,000 will be reimbursable from federal funds under 42 U.S.C.A. § 1320a–1. In addition, plaintiff will be able to recover a share of its debt service on this expenditure, and some share of its other capital-related expenses. The share of these aggregate expenditures which will be reimbursable over the life of the hospital will be determined by the share of its billings which are to be repaid by Medicare/Medicaid and other federal programs. If two-thirds of Lakeside's patients present their bills for federal repayment, then two-thirds of Lakeside's depreciation and other capital expenses will be repaid by the Government. Even taking Lakeside's conservative estimate of initial cost, and ignoring debt service and all other expenses, it is clear that for the amount in controversy to be $10,000 or less, fewer than one-third of one percent of Lakeside's patients would have to be Medicare/Medicaid recipients. There is, by reasonable implication, a probability that at least $10,001 is in controversy.

■ Defendant Parkview, in its preliminary brief in support of its motion to dismiss, suggests that this suit does not really and substantially involve a federal question. Although the central dispute in this suit as raised by defendants' answers concerns the effect of a state court restraining order, the existence of a federal question is to be ascertained solely from plaintiff's well-pleaded complaint. *Gully v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Plaintiff alleges an entitlement to federal funds, noncompliance with a federal statute by an agency of the government, and denial of constitutional rights by federal agents. The controversy involves the construction of a federal statute and the regulations issued thereunder. In a very real and immediate sense, there is federal involvement. *See Gully, supra* at 114, 57 S.Ct. 96.

Accordingly, there is jurisdiction under 28 U.S.C.A. § 1331. The propriety of finding

jurisdiction under other statutes,[8] although extensively briefed by the parties, need not be decided, since each of plaintiff's substantive claims may be considered under the federal question jurisdiction.

### The State Court Injunctions

Plaintiff's case in chief is syllogistic: Federal regulations required the ISBH to act upon plaintiff's application within 15 days after December 9, 1974, or else the application would be deemed to be approved; the ISBH did not act on the application until July 9, 1975; therefore, the application should be deemed approved. Plaintiff also notes that except for one exception not relevant here, the time clock requirement is unqualified.

Defendants in turn seek to impose a qualification, by reasonable inference, upon the otherwise absolute time clock mandate. It is their contention that an injunction issued by a court of competent jurisdiction[9] restraining the designated planning agency from proceeding with *all* proposals necessarily tolls the time clocks as to those proposals.

It appears without contradiction that on October 4, 1974, Community Hospital (a group competing with Lakeside and with the existing hospitals) filed suit in Allen County Circuit Court, Indiana, seeking review of the ISBH's rejection of its proposal to meet the bed shortage in the Fort Wayne area. At this time Lakeside's proposal was awaiting consideration by the ISBH, and the existing hospitals' proposals were before a subordinate body ("Region 3"). On November 12, 1974, Community amended its complaint to include Region 3 as a party defendant, and sought temporary restraining orders enjoining the ISBH and its sub-ordinate agency from proceeding further with the existing hospitals' competing applications. This relief was found to be appropriate because of the time clock requirement, and on November 12 the temporary restraining order was issued. This order did not affect the ISBH consideration of plaintiff's proposal. Plaintiff does not challenge the state court's jurisdiction thus far, or the propriety of issuing this TRO.

On November 26, 1974 the ISBH requested a change of venue from Allen Circuit Court. It appears that on the same day, Lutheran, St. Joseph and Parkview Hospitals sought to intervene as parties defendant in that suit so as to protect their interests. On December 9, 1974, before the three hospitals had been technically permitted to intervene as defendants, all parties accepted the Wells Circuit Court as the court to which venue would be taken. That same day, counsel for Parkview, a putative intervenor, deposited with the Wells Circuit Court a copy of the record thus far in the case, which it had itself assembled (Parkview noted at the time that the Clerk of the Allen Circuit Court had been unable in the interval to assemble and transmit the transcript). On December 9, 1974, the same day, the Wells Circuit Court renewed and modified the temporary restraining order initially issued by the Allen Circuit Court. It is this order which first precluded the ISBH from acting upon Lakeside's proposal. The order provided:

> The Indiana State Board of Health is further enjoined and ordered not to consider, act upon, or approve (including any election to take "no-action" whenever such non-action would constitute approval) on any proposals by any other person, firm or entity which proposals are designed or intended to meet substantially

---

8. It is thus unnecessary to enter into the conflict over whether 28 U.S.C.A. § 1361 is jurisdictional at all, *see United States v. Commonwealth of Pennsylvania*, 394 F.Supp. 261, 263–64 & nn. 3–4 (M.D.Pa.1975) and cases there cited. Although many of defendants' objections to 1343(3) and (4) jurisdiction and to "jurisdiction" under the Declaratory Judgment Act are well taken, a ruling is unnecessary.

9. Plaintiff contends that to allow a state court to interfere with the federally mandated timetable in this case would serve as precedent for allowing state courts to enjoin any federal agency proceeding. The crux of the matter is subject jurisdiction. Except where Congress places exclusive federal jurisdiction in the federal courts, there is no objection where a state court with jurisdiction over the parties enforces federal law.

the same need or to provide substantially the same health care facilities as the proposal of the plaintiff in this action. . .

Lakeside's proposal, then before the ISBH, would have provided for substantially the same health care, and would have met substantially the same needs, as the proposal by Community Hospital. On December 18, 1974 the TRO was renewed, and on December 31, 1974 the restraining order was superseded by a preliminary injunction *pendente lite*, entered with the consent of the parties, which incorporated the same prohibition against ISBH consideration of *all* competing proposals. Cross-motions for summary judgment were thereafter filed, and on May 27, 1975 the Wells Circuit Court entered summary judgment for the defendants. With the conclusion of the litigation, the injunction *pendente lite* was dissolved, but as part of the relief sought by the defendant hospitals the court issued a new injunction whereby the ISBH was prohibited from proceeding with Lakeside's proposal until the proposal of the existing hospitals could be transmitted from Region 3, which was then considering it. This relief was justified because the court's previous orders had frozen consideration of all proposals at whatever level they were then pending. That is, the joint proposal of Parkview, Lutheran, and St. Joseph Hospitals had been frozen at the Region 3 level by the restraining order of November 13, 1974, while Lakeside's proposal before the ISBH was not frozen until December 9, 1974. By allowing Region 3 to complete its investigation while holding ISBH consideration of Lakeside's application in abeyance, the court in effect returned the applicants to the same relative positions they would have been in had the court not issued the separate restraining orders on November 13 and December 9.

It is plaintiff's contention that the temporary restraining order of December 9, the renewal on December 18, and the preliminary injunction of December 31 were issued without jurisdiction, such that they had no effect on ISBH's duty to process Lakeside's application. Assuming without deciding

that for federal purposes the rule 100.106 time clock will be tolled only where an injunction against its running has been issued by a court whose jurisdiction is properly laid as a matter of state law, it nonetheless appears that the Wells Circuit Court properly obtained jurisdiction on or prior to December 9, 1974.

The order book entry of the Allen Circuit Court *granting* the motion for change of venue was made November 26, 1974. On December 9, 1974, the parties stipulated that venue would be changed to Wells Circuit Court. On the same day, venue was *accepted* by order of that court.

■ The problem, simply stated, is when does the receiving court acquire jurisdiction to issue emergency orders. In Indiana, the process for effecting a change of venue appears to be simple, but the effect of the various steps on the courts' respective jurisdictions is ambiguous. In general, once a motion for change of venue has been filed, the court retains jurisdiction only to determine and grant the motion. However, after granting the motion and until the change of venue is completed, the original court retains the power to issue emergency orders, such as the temporary restraining order at issue in this case. *Smith v. Indiana St. Bd. of Health,* 303 N.E.2d 50 (Ind. App.1973); *cf.* Ind. TR. Rule 78.

■ The completion of the change of venue is described in TR. Rule 78: "either party to the cause may file a certified copy of the order making such change in the court to which such change has been made, and thereupon such court shall have full jurisdiction of said cause, regardless of the fact that the transcript and papers have not yet been filed with such court to which such change is taken." The latter provision appears to be a reference to Ind.Code § 34–1–13–2 (Burns 1973), where it appears that perfection of the change of venue required the transmittal of the transcript and papers. To the extent that TR. Rule 78 and Ind.Code § 34–1–13–2 conflict, the Trial Rule governs. *Hutchison v. Wheeler,* 251 Ind. 386, 241 N.E.2d 261 (1968).

It thus appears that in order for the receiving court to have "full jurisdiction," a party need only receive a certified copy of the order granting the change of venue from the clerk of the original court and file the copy with the clerk of the receiving court. In this case, however, this procedure was not precisely followed. Parkview's affidavit submitted to the Wells Circuit Court recites that the Clerk of the Allen Circuit Court refused to timely certify the change of venue order, "claiming that he lack[ed] sufficient personnel to make the copies in conformance to the rules and procedures of the Clerk of Allen County." Counsel for Parkview thereupon paid to the clerk the costs for transfer of the case, and caused the transcript and record to be reproduced at his own direction, and filed this record, under his own affidavit, with the Wells Circuit Court.

It appears that the record thus transmitted was satisfactory to all the parties and to the Wells Circuit Court. Lakeside does not claim that the record was not complete or that it had been altered. The official record was not transmitted to the Wells Circuit Court until January 16, 1975.

 Resolution of this jurisdictional problem rests upon an analysis of the purpose of TR. Rules 76 and 78. Rule 76 broadly provides that the change of venue, and hence of jurisdiction, shall be effective upon the issuance of the *order granting* the change of venue. Jurisdiction of some sort passes immediately to the receiving court, upon its selection. Rule 78, however, explains the circumstances under which the original court is fully ousted of its jurisdiction when the change of venue is granted. That is, the "some jurisdiction" granted to the receiving court by Rule 76 becomes "full jurisdiction" in that court once a certified copy of the change of venue order is filed. The power of the original court to issue necessary emergency orders prior to granting the change of venue (TR. Rule 78), or prior to the time the receiving court has received the record of the proceedings such that it can intelligently issue emergency orders (*see Smith, supra*) are instances in which the original court retains "some jurisdiction" and the receiving court acquires "some jurisdiction." Case decisions involving this problem (*see Smith, supra*, and cases there discussed) have ruled only as to the extent of the original court's retained jurisdiction, and have not addressed themselves to the question of the receiving court's acquired jurisdiction. The rationale of the *Smith* decision, and of *Indianapolis Dairymen's Co-op. v. Bottema*, 226 Ind. 260, 79 N.E.2d 409 (1948) and *State ex rel. Gwin v. Spencer*, 220 Ind. 337, 43 N.E.2d 724 (1942), is that the mechanics of venue change must provide the parties with a convenient forum in which emergency matters can be determined. Consistent with this, the better rule is that once the change of venue has been *granted* and the receiving court has *accepted* the case, the litigants at their option may seek emergency relief in either the original court pursuant to *Smith, supra*, or in the receiving court pursuant to TR. Rule 76. The presence or absence of the record, whether officially certified or not, is not a jurisdictional prerequisite, *see* TR. 78, but in the discretion of the receiving court the absence of the complete record may be grounds for refusing the emergency relief sought.

 It appears that the Wells Circuit Court was satisfied with the state of the record it then had, and that it had jurisdiction to issue the temporary restraining order of December 9, 1974. Plaintiff urges that since the materials were transmitted to the Wells Circuit Court by counsel for Parkview, not then a party, the requirements of Rule 78 were not met. But since Rule 78 determines when the original court is ousted of its jurisdiction, not when the receiving court first obtains jurisdiction, at most this would mean that the Allen Circuit Court could have entertained the motion for temporary restraining order until January 16, 1975. It does not mean that the Wells Circuit Court could not likewise have entertained the motion. Under the unusual circumstances of this case, the conclusion is warranted that the Wells Circuit Court acted within its jurisdiction.

Turning to the merits of the injunctions, including the injunction issued May 27, 1975, Lakeside urges that the injunctions were improper since they affected the rights of a nonparty. Under such circumstances, Lakeside would properly have had the right to intervene to assert and defend its interests. It chose not to do so. And since the ISBH was properly a party before the Wells Circuit Court, Lakeside in effect urges that the ISBH should have determined that the injunction was improper, and should thereupon have proceeded to process Lakeside's application. Even assuming *arguendo* that the injunctions were in some way improper, the ISBH's duties are clear:

> We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but absent a stay, to comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975). Injunctive orders pendente lite affecting the rights of nonparties are no different. *Cf. Nebraska Press Ass'n v. Stuart,* 423 U.S. 1319, 96 S.Ct. 237, 46 L.Ed.2d 199 (1975).[10]

The final question is whether 42 U.S.C.A. § 1320a–1 and 42 C.F.R. § 100.-106(a)(4) by inference permit the tolling of an applicant's time clock under the circumstances of this case. Section 1320a–1 requires that applications be processed within a "reasonable period after receiving [notice of the intended expenditure]." Nowhere does this provision suggest an exception to the "basic proposition that all orders and judgments of courts must be complied with promptly," *Maness, supra,* 95 S.Ct. at 591. Indeed, it would be unreasonable to require the designated planning agency to process competing applications at a time when pending litigation might establish a prior entitlement in a previously unsuccessful applicant. The Secretary agrees, however, that the time clock regulations as written simply did not anticipate the situation of this case, and that the otherwise absolute time requirement should be construed to include by inference a tolling provision whenever the designated planning agency is subject to jurisdictionally appropriate court-ordered restraint. This construction is sound, and avoids unnecessary friction between the agencies and the courts.

Accordingly, the court finds that Lakeside's time clock did not restart until June 30, 1975, at which time Region 3 transmitted the proposals of the existing hospitals to the ISBH, and that the adverse decision rendered July 9, 1975, was within the 15-day period remaining on Lakeside's time clock.[11]

Since Lakeside is clearly not entitled to a declaratory judgment holding the status of its application to be approved as a matter of law, there are no grounds for considering the jurisdiction for or the merits of plaintiff's claims under 28 U.S.C.A. § 1361.

In light of the foregoing discussion, plaintiff's claim that the ISBH's obedience of the injunctions denied it due process of law or the equal protection of the laws is without merit.

### *"Conspiracy"*

Plaintiff's amended complaint added new allegations concerning a certain agreement among the ISBH and the three existing hospitals. The factual predicate as alleged is that "with the consent and knowledge of

10. Lakeside's argument that the injunctions were not issued in conformity with Ind.TR. Rule 65 are matters which affect the validity of the injunction, not the jurisdiction, and therefore are not relevant in ascertaining the ISBH's duty to obey the injunction between its issuance and its dissolution.

11. It was stipulated that on December 5, 1974, only 19 days remained on Lakeside's time clock. *See* note 7 *supra.* The injunction against consideration of Lakeside's proposal was entered December 9, 1974, that is, 4 days later. Hence, as of December 9, there were 15 days remaining on the time clock.

the Indiana State Board of Health, the three existing Fort Wayne hospitals . . have devised a plan and scheme under which they have allocated to themselves exclusively the bed allotment . . . for the Fort Wayne area." Plaintiff therefore seeks as relief an injunction prohibiting the ISBH from acting on the joint application. Since the ISBH has already approved the joint application, plaintiff's relief would now be against the Secretary.

The undisputed facts are these: On May 27, 1975, the Wells Circuit Court dissolved its injunction in which Region 3 had been prohibited from considering the proposals of the existing hospitals for fulfilling the bed allocation in the Fort Wayne area. At that time, each hospital's proposal was independent of the others; consequently, the total beds sought was in excess of the maximum permissible. By that time, it was clear that Community's proposal was ineligible, for the reason (as accepted by the Wells Circuit Court) that the Hill-Burton plan, while authorizing an additional 172 beds for the Fort Wayne area, did not authorize the construction of a new hospital to meet that need. Although the ISBH had proposed an amendment to the Hill-Burton plan whereby a fourth hospital could be considered, approval by the Secretary was not issued until July 3, 1975. Hence, the ISBH's only pending application—Lakeside's—was likewise defective in that it also called for a new hospital.

Starting around May 30, 1975, the existing hospitals initiated meetings and telephone conversations with the officers of the ISBH in an attempt to discuss the feasibility of a joint proposal by the existing hospitals (permissible under the then-existing Hill-Burton plan) to meet the 172-bed allocation. The ISBH encouraged the hospitals to agree among themselves on a bed allocation and to submit a joint revised proposal based on that bed allocation. By the terms of the injunction then in force, the ISBH would withhold consideration of Lakeside's proposal until it received this joint proposal. If the amendment to the Hill-Burton plan were not forthcoming, the ISBH would

then have to reject Lakeside for the same reasons it had to reject Community; if the amendment were accepted, it could consider Lakeside and the joint proposal on an equal footing. It should be noted that if the Hill-Burton plan had not been amended, then no combination of existing proposals would have adequately met the full 172-bed need in the Fort Wayne area.

Plaintiff's challenge to this procedure must first withstand the test of standing. Plaintiff does not challenge the ISBH's finding that its own proposal was not in conformity with the state plan, nor does it challenge the ISBH's determination that the existing hospitals' joint proposal did conform to the state plan. Even should this court order the Secretary to reject the joint proposal (a form of relief which is only debatably within the power of this court), plaintiff would still not be entitled to approval of its own proposal. Plaintiff's "personal stake in the outcome of the controversy" is tenuous at best. *See Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). But even if plaintiff may proceed as a "private attorney general," *Sierra Club v. Morton, supra,* 405 U.S. at 737–38, 92 S.Ct. 1361; *Association of Data Processing Serv. Org. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in that there is no other likely class of plaintiffs who would challenge agency favoritism in approving Section 1320a–1 determinations, on the merits there is no basis for plaintiff's claim. The ISBH's encouragement of the joint proposal was for the legitimate purpose of obtaining conforming proposals for the construction of hospital facilities. At the time the ISBH first became aware of the hospitals' desire to submit a joint proposal, the decision in the Community Hospital case foreclosed consideration of Lakeside's proposal unless the Hill-Burton plan was successfully amended. Conforming proposals could come only from the existing hospitals. Those proposals, however, independently sought various numbers of beds which, when taken together, surpassed the maxi-

mum allowance. When at the instance of the existing hospitals the ISBH was asked whether it would be permissible to propose a joint bid, maximizing the number of beds in the Fort Wayne area, consistent with the then-existing Hill-Burton plan, it was not illegal for the ISBH to "encourage" this voluntary solution to the bed allocation problem. There is no evidence that the motivation of the ISBH in encouraging this joint proposal was favoritism towards the existing hospitals; rather, it appears that the ISBH was justifiably concerned that it would soon have no acceptable proposal before it because of the delay in the approval of the Hill-Burton plan amendment.

### Order

Accordingly, plaintiff's motion for summary judgment is granted in part, and to that extent it is hereby declared and adjudged that the Agreement between the Secretary of Health, Education and Welfare and the State of Indiana made pursuant to 42 U.S.C.A. § 1320a–1 contains the following provision, which is binding on the State, its agents and employees:

> The failure of the designated planning agency to provide any such notification within the time limitations set forth above shall have the effect of a determination described in paragraph (a)(4)(i) of this section.

In all other respects, plaintiff's motion for summary judgment is denied.

Defendants' motions to dismiss for lack of jurisdiction over the subject matter are each denied.

Defendants' motions to dismiss for failure to state a claim on which relief can be granted are treated as motions for summary judgment pursuant to Rules 12(b) and 56, Fed.R.Civ.P., and are denied insofar as partial summary judgment has been granted above to plaintiff; in every other respect the motions are granted, and judgment shall be entered that plaintiff is entitled to no relief except that specifically above granted.