615 F.2d 112
 WILMINGTON UNITED NEIGHBORHOODS, Edith Beck, John J. and
Frances Bradley, Joseph J. Breen, Thomas X.
Carroll, Joseph G. DiPinto, Ethel B.
Tynes, Alice Wilson, Appellants,
v.
UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE,
Amos M. Burke, as Director of the Bureau of Health Planning
and Resources Development, Robert H. Sweeney, Delaware
Health Council, Inc., Wilmington Medical Center, Inc. (D.C.
Civil No. 77-0439).
WILMINGTON MEDICAL CENTER, INC., a non-profit corporation of
the State of Delaware
v.
Joseph A. CALIFANO, Jr., as Secretary of the Department of
Health, Education and Welfare and Wilmington
United Neighborhoods,
(Defendant-Intervenor),
Appellant (D.C.
Civil No. 77-0480).
 Nos. 78-2633, 78-2634.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 4, 1979.
Decided Feb. 6, 1980.
 
 Marilyn G. Rose, Herbert Semmel, (Argued), Center for Law and Social Policy, Washington, D. C., Douglas Shachtman, Community Legal Aid Society, Inc., Wilmington, Del., for appellants in No. 78-2633 and defendant-intervenor-appellant in No. 78-2634.
 Edward F. Kafader, (Argued), Deputy Atty. Gen., Dover, Del., for appellees, Amos M. Burke and Robert H. Sweeney.
 William J. Wade, (Argued), Rodney M. Layton, Richards, Layton & Finger, Wilmington, Del., for appellee, Wilmington Medical Center, Inc.
 Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., James W. Garvin, Jr., U. S. Atty., Wilmington, Del., William G. Kanter, Alfred Mollin, (Argued), Appellate Staff, Civil Div., U. S. Dept. of Justice, Washington, D. C., for appellees, Joseph Califano, Jr. and Department of Health, Education and Welfare; Joan Garner, Dept. of Health, Education and Welfare, Philadelphia, Pa., of counsel.
 Michael D. Goldman, Potter, Anderson & Corroon, Wilmington, Del., for appellee, Delaware Health Council, Inc.
 Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This appeal represents the latest chapter in a long battle by consumers of medical services to prevent the removal and relocation of hospital services from the inner-city to suburban Wilmington. The plaintiffs have appealed from orders granting various motions dismissing their case against the U. S. Department of Health, Education and Welfare (HEW), the Bureau of Comprehensive Health Planning of Delaware (BCHP) and the Wilmington Medical Center, Inc. (WMC). The court below held that it was precluded by Section 1122(f) of the Social Security Act, 42 U.S.C. § 1320a-1(f), from considering the appellants' challenges to certain administrative determinations made by the Secretary of HEW and the BCHP. It also held that the appellants, as consumers of medical services and not proponents of capital expenditures, were not entitled to a hearing under Section 1122 and therefore were not denied equal protection under the fifth and fourteenth amendments. We will affirm.
 
 I.
 
 2
 The Wilmington Medical Center, Inc. (WMC) is a private, nonprofit hospital and the primary provider of hospital services in New Castle County, Delaware. For several years, WMC has engaged in extensive planning to determine how best to restructure the hospital system in order to improve health care delivery. The product of this planning was Plan Omega, an $88 million capital expenditure program that would relocate major components of WMC's medical system to an outlying suburban location. The capacity of a remaining inner city facility would be reduced to approximately 250 beds.
 
 
 3
 WMC and its controversial Plan Omega are not strangers to this court. In NAACP v. Medical Center, Inc., 584 F.2d 619 (3d Cir. 1978), the plaintiffs individuals and organizations representing the poor, the elderly, the handicapped, and several racial and ethnic minorities of Wilmington argued unsuccessfully that HEW's approval of the Medical Center's capital expenditure plan constituted major federal action requiring the preparation of an environmental impact statement under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347. In NAACP v. Medical Center, Inc., 599 F.2d 1247 (3d Cir. 1979), the same plaintiffs subsequently asserted that they had a private right of action to challenge the proposed health facility relocation for its alleged discriminatory impact. Finding that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, created private rights of action for plaintiffs who seek relief other than funding termination, this court reversed the dismissal of the district court and remanded the cases to the district court for a trial on the merits.
 
 
 4
 The attack on Plan Omega in this case is directed at the approval of the Plan by HEW and various state agencies under a system established by Section 1122 of the Social Security Act, 42 U.S.C. § 1320a-1.
 
 
 5
 a. Statutory Background
 
 
 6
 Section 1122 is a program designed to curb unnecessary capital expenditures by hospitals and other health care facilities. In general, this goal is accomplished by requiring hospitals to secure advance approval of their capital projects from state health care planning agencies. Health facilities that submit plans of proposed capital expenditures to the State and subsequently have them approved are reimbursed with federal funds for that portion of a patient's bill constituting capital costs, that is, depreciation, interest or return on equity capital.
 
 
 7
 The State of Delaware has entered into such an agreement with HEW and designated the BCHP as the State's designated planning agency (DPA) to carry out its responsibility under Section 1122. Under the statute, the DPA is charged with reviewing proposed capital expenditures to determine whether they are consistent with the standards or plans developed to meet the need for adequate health care facilities in the area of the state affected. 42 U.S.C. § 1320a-1(b). The DPA is required to consult with local health planning agencies interested in a particular proposal and to submit to the Secretary of HEW the findings of those agencies on the proposed expenditure and the DPA's own findings and recommendations, along with any supporting materials deemed necessary by the Secretary. Id. The DPA is also required to establish procedures for affording proponents of a capital expenditure found to be unnecessary "an opportunity for a fair hearing." 42 U.S.C. § 1320a-1(b)(3).
 
 
 8
 Following its approval by the DPA, the Secretary then performs the ministerial act of assuring that the proper procedure has been followed. If, however, the expenditures have been found by the DPA to be inconsistent with the state or local health care facility needs or plans, the Secretary may, in certain limited instances, override the State's recommendation. 42 U.S.C. § 1320a-1(d) (2). Finally, Section 1122(f) provides:
 
 
 9
 Any person dissatisfied with a determination by the Secretary under this section may within six months following notification of such determination request the Secretary to reconsider such determination. A determination by the Secretary under this section shall not be subject to administrative or judicial review.
 
 
 10
 42 U.S.C. § 1320a-1(f). This provision and its meaning are at the heart of this appeal.
 
 
 11
 b. Facts
 
 
 12
 On March 19, 1976, WMC sought Section 1122 approval for Plan Omega. As required by the statute, WMC made an application to the Delaware BCHP and to a local health planning group for review of the relocation plan. Following a substantive review of Plan Omega, the state and local agencies certified it as necessary.[1] The DPA forwarded its finding to the Secretary who then issued a Section 1122 approval of Plan Omega in August of 1976. As a result of this approval, WMC was assured that the Secretary would not withhold payment of the capital component of WMC's charges to patients under Medicare, Medicaid, and child health programs on the ground that the component charge was the product of an unnecessary capital expenditure.
 
 
 13
 On September 10, 1976, the complaint, challenging Plan Omega under Title VI of the Civil Rights Act, was filed in the district court. On January 19, 1977, the district court ordered HEW to investigate the charges of those plaintiffs that Plan Omega was in violation of Title VI and Section 504 and to report its findings back to the court. 426 F.Supp. 919 (D.Del.1977).
 
 
 14
 On July 5, 1977, during the course of that litigation, the Secretary of HEW, through the Office for Civil Rights (OCR), found Plan Omega in violation of Title VI. The Secretary indicated that Plan Omega might comply with Title VI and Section 504 if WMC made certain changes in the Plan. As a result, a contract was executed between WMC and HEW on November 1, 1977 in which WMC agreed: to provide a transportation system for patients, employees, and visitors between the urban and suburban locations; to institute a patient allocation system for services that were available at both locations; and to alter construction and renovation plans in order to accommodate handicapped persons.
 
 
 15
 In the interim, on February 4, 1977, the plaintiffs in the instant case exercised their statutory prerogative under Section 1122(f) by requesting the Secretary to reconsider his August 6, 1976 determination to approve Plan Omega under Section 1122. On September 7, 1977, Harold Margulies, M.D., Acting Administrator of the Health Resources Administration of HEW, responded to the request for reconsideration and affirmed the prior determination of August 6, 1976 which approved the plan. Dr. Margulies' letter stated that if WMC agreed to make the modifications required to comply with Title VI and Section 504, it would have to submit the modified Plan Omega in its entirety to the BCHP for another Section 1122 review. On October 12, 1977, however, Dr. Margulies disavowed such an interpretation stating that any such reconsideration would be inconsistent with the Section 1122 program regulations. He stated further that if changes were made in Plan Omega to satisfy OCR, those changes would be subject to Section 1122 review only to the extent that any one or more of them amounted to a "capital expenditure" as defined by the regulations[2] and were deemed by the DPA to warrant review.[3]
 
 
 16
 On November 11, 1977, Wilmington United Neighborhoods (WUN) initiated Wilmington United Neighborhoods, et al. v. Department of Health, Education and Welfare, et al., (WUN v. HEW ), (No. 78-2633), seeking to invalidate the approvals under Section 1122 of Plan Omega by HEW and the state and local health planning agencies on the grounds that they had violated their duties as mandated by Section 1122 and the fifth and fourteenth amendments to the constitution. On December 22, 1977, WUN amended its complaint naming WMC as a party-defendant, seeking, inter alia, a declaration that WMC had violated regulations implementing Section 1122 on several grounds.
 
 
 17
 WMC initiated Wilmington Medical Center, Inc. v. Califano, (WMC v. Califano ) (No. 78-2634) arguing in its complaint, which was accompanied by a Motion for a Temporary Restraining Order, that the litigation challenging Plan Omega amounted to a de facto injunction since it precluded WMC from obtaining favorable financing. WMC requested, inter alia, a declaration that the time within which WMC was required by regulation to secure a contract for its proposed capital expenditure be tolled during the pendency of litigation challenging Plan Omega. On December 13, 1977, the district court denied WMC's Motion for a Temporary Restraining Order and granted WUN's motion to intervene as a party-defendant in WMC v. Califano. On December 14, 1977, one day before Section 1122 approval was to lapse, WMC signed a contract with the Gilbane Building Company. On December 27, 1977, five days after the amended complaint in WUN v. HEW was filed naming WMC as a party-defendant, WMC filed an Answer, Cross-Claim and Counterclaim in WMC v. Califano, in which it raised all the same issues that had been raised in WUN v. HEW. The only distinction, therefore, between the two cases is the claim by WMC for a declaratory judgment against HEW. This latter claim was denied, and no appeal taken.
 
 
 18
 The district court rejected all of WUN's claims and granted all of the motions for summary judgment that had been filed against WUN by the defendants. 458 F.Supp. 628 (D.Del.1978). This appeal followed.
 
 II. Standing
 
 19
 We address first the threshold question of whether the appellants have standing. At the outset, we note our agreement with the oft-quoted language of Justice Douglas that "(g)eneralizations about standing to sue are largely worthless as such." Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1960). However, out of this muddled area of the law, two inquiries for determining standing can be distilled: whether the plaintiffs have shown an injury to themselves that is likely to be redressed by a favorable decision[4] and whether the interest sought to be protected "is arguably within the zone of interests to be protected or regulated by the statute . . ."[5]
 
 
 20
 The appellants are residents of Wilmington and consumers of health services. WMC is at present the primary provider of health care services at Wilmington. Its Plan Omega would result in the relocation of a substantial portion of the hospital services presently offered Wilmington's residents. The Department of HEW and the various state and local planning agencies approved Plan Omega for Section 1122 purposes. As a result of this approval, HEW committed itself not to withhold the capital cost component of WMC's charges to patients under Medicare, Medicaid and child health programs. The gravamen of the complaint is that the Section 1122 approval was based on improper statutory and administrative procedures and untrustworthy information; and that absent such approval, Plan Omega is not financially feasible.[6] Thus, it is clear that the Section 1122 approval could result in the loss to the plaintiffs of "necessary, accessible and cost efficient health care."[7]
 
 
 21
 Section 1122 denies reimbursement for unnecessary capital expenditures in the hope of promoting rational health planning and cost containment. Implicit in this legislative scheme is the assumption that more efficient use of health care dollars results in more effective delivery of health care services. We believe that the appellants, as consumers of health care services in Wilmington, have a sufficient stake in the outcome of this controversy and are clearly within the zone of interests Section 1122 was designed to protect.
 
 III. Claims Against HEW
 
 22
 Two claims against HEW are pressed on appeal. The first is that HEW violated its obligation under Section 1122 by failing to determine whether the approval of Plan Omega by the DPA was consistent with federal standards and criteria and federally-approved plans.
 
 
 23
 We begin with an examination of the controlling precepts:
 
 
 24
 " '(J)udicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress.' A clear command of the statute will preclude review; and such a command may be inferred from its purpose. . . . It is, however, 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent' that the courts should restrict access to judicial review."
 
 
 25
 Barlow v. Collins, 397 U.S. 159, 166-167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970), quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140-141, 87 S.Ct. 1507, 1510-1511, 18 L.Ed.2d 681 (1967). The command of Section 1122(f) cannot be clearer. It provides in the clearest of terms that "(a) determination by the Secretary under this section shall not be subject to administrative or judicial review."
 
 
 26
 In order to avoid the unequivocal bar to judicial review provided in Section 1122(f), the appellants assert a distinction between "substantive" and "procedural" determinations by the Secretary. That is, because "the issue goes to the power to make determinations, not the determination itself," Brief of Appellants at 24, Section 1122(f) does not preclude review. We disagree and find no support either in the statute or in its history to support such an ethereal distinction.
 
 
 27
 In Briscoe v. Bell, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), the Supreme Court rejected a similarly artificial distinction. At issue in that case was Section 4(b) of the Voting Rights Act of 1965 which provides that a determination of the Attorney General or Director of the Census that a State is covered by the Act "shall not be reviewable in any court." The lower courts in that case had held that notwithstanding this language there was jurisdiction to consider the "pure legal question" whether the executive officials had correctly interpreted an Act of Congress. The Supreme Court unanimously reversed stating "(t)he language is absolute on its face and would appear to admit of no exceptions." Id.
 
 
 28
 The appellant's argument also rests on the erroneous premise that the Secretary is empowered to perform an independent review of the DPA's findings. As this court held in NAACP v. Medical Center, Inc., 584 F.2d at 628, the Secretary has mere ministerial duties where a state has approved an application; he therefore lacks discretionary power to override the decision of the DPA once the state agency has approved, by proper procedure, a proposed capital expenditure.
 
 
 29
 The second claim made against HEW implicates the integrity of administrative decision making. The appellants argue that HEW reversed its earlier determination that Plan Omega, as modified to comply with the findings of the Office for Civil Rights, required a new Section 1122 review "on the basis of the influence of a personal friend of the President," Brief of Appellant at 20, and that this claim is not within the reach of Section 1122(f)'s preclusion of review provision.
 
 
 30
 The claimed influence was in the form of a letter received by Secretary Califano on September 30, 1977 from Irving Shapiro, Chairman of the Board of the DuPont Company.[8] The appellants variously describe Shapiro as an "unofficial economic advisor to the President," Brief of Appellant at 13, "a close associate and personal friend of the President," Id. at 20, and as "a powerful economic figure, a personal friend and advisor to the President." Id. at 25.
 
 The district court held:
 
 31
 As the October 12 letter to the plaintiffs' counsel illustrates, however, the Secretary based his decision on his interpretation of the statute and the regulations implementing it. The fact that HEW apparently had reached a contrary conclusion only a month earlier, or that the interpretation may be erroneous as a matter of law, or that the Secretary's decision may have been influenced by a letter from a business leader and personal friend of the President is irrelevant, because in any of those events section 1122(f) would still preclude judicial review. See Briscoe v. Bell, supra, 432 U.S. at 409-15, 97 S.Ct. 2428.
 
 
 32
 458 F.Supp. at 639 (footnotes omitted). It is clear that the Secretary determined that under the applicable regulations, no new Section 1122 review of Plan Omega would be required, even if Plan Omega was modified to comply with the finding of the Office of Civil Rights. Such a determination is manifestly unreviewable by the terms of Section 1122(f).
 
 
 33
 The cases relied on by the appellants are significantly distinct, both factually and legally, from the instant case. In United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489 (2d Cir. 1950), the court affirmed a district court's refusal to grant an alien a hearing to review whether the Attorney General had abused his discretion in failing to suspend a deportation order. According to Chief Judge Learned Hand, "unless the ground stated (in the Attorney General's order) is on its face insufficient, he must accept the decision, for it was made in the 'exercise of discretion,' which we have again and again declared that we will not review." Id. at 490. Texas Medical Association v. Mathews, 408 F.Supp. 303 (W.D.Tex.1976) and D. C. Federation of Civil Associations v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231 (D.C. Cir. 1972) involved the scope of authorized judicial review and not the power to undertake review in the face of an express statutory preclusion.
 
 
 34
 Moreover, the nature and degree of the pressures exerted in those cases were significantly different than in the instant case. In Mathews, the pressure was "that he must either change his position or his job would be at stake." 408 F.Supp. at 309. There was repeated and vocal public pressure by a Senator and a staff member of the Senate Finance Committee. In Volpe, there were clear threats of a loss of appropriations.
 
 IV. Claims Against the DPA
 
 35
 The appellants also charge: that the DPA's approval of Plan Omega was inconsistent with applicable standards, criteria and plans; that DPA violated its obligations under Section 1122 by failing to consider and determine that the June 9, 1976 modification of Plan Omega required a Section 1122 review; that the DPA violated its obligations under Section 1122 by failing to consider and determine that the changes required to comply with the findings of the Office of Civil Rights required a complete review of the entire project. Because these are not "determinations by the Secretary," the plaintiffs contend that review is not precluded by Section 1122(f). The district court held that while "section 1122(f) does not expressly preclude judicial review of DPA approvals, . . . nonreviewability may be inferred from a statute's purpose and its legislative history." 458 F.Supp. at 641. We agree. Congress intended with Section 1122 to contain "hospital costs by limiting federal reimbursements covering capital expenditures for health care to those expenditures deemed necessary by the state " and to encourage "rational health planning by the states." NAACP v. Medical Center, Inc., 584 F.2d at 627-628 (emphasis supplied). The legislative history demonstrates that Congress envisioned that "(t)he bill would in no way change the autonomy or authority of existing State or local planning agencies." H.R.Rep.No.231, 92d Cong., 2d Sess., reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 4989, 5066. The surest way to "change the autonomy or authority of existing State or local planning agencies" is to hold that the DPA's determinations are reviewable. We decline to do so.
 
 The district court correctly reasoned:
 
 36
 Given the prohibition on judicial review of the Secretary's decision set forth in Section 1122(f), it is inconceivable that Congress could have intended the Federal Judiciary to play a more active role than the Secretary by reviewing under any standard the substance of the DPA's approval of a proposed capital expenditure.
 
 
 37
 458 F.Supp. at 641.
 
 
 38
 The appellants argue, however, that Section 1122 is a "federal" program which requires, for the sake of uniformity, the intervention of the federal courts. They argue further that if "the causes against the DPA are precluded from federal judicial review, it is possible to have 50 different interpretations and applications of the federal regulations." Brief of Appellants at 36. We find these arguments unpersuasive. Statutes precluding judicial review would be rendered meaningless if the federal courts could always intervene in so-called "federal" programs. Moreover, we reject the appellants' underlying premise that the program is a "federal" one. All evaluations of the merits of health programs are conducted at the state and local level. The relevant passages of the legislative history are appropriately titled "Limitation on Federal Participation for Capital Expenditures" and evidence a concern for federal participation in an essentially local effort rather than federal control and direction of a federal program. The regulations are not patterned to bring about rigid federal uniformity. On the whole, it is clear that the states' role in health care planning was not to be supplanted.
 
 
 39
 Our disagreement with the dissent is basic and fundamental. First, the dissent has failed to explain the incongruity that results from its approach that Congress could have intended to provide federal judicial intervention and review of the state DPA decisions while at the same time precluding such federal judicial intervention and review generally of the decisions of the federal administrator, the Secretary of HEW. To allow the review of the DPA decisions as urged by the dissent disregards the fact that the DPA is a single step in an administrative decision-making process where Congress was clearly concerned about making the Section 1122 review process a streamlined procedure. See 42 C.F.R. § 100.106(a)(2).
 
 
 40
 Second, the dissent's argument rests on the erroneous premise that the program here is a "federal" one. As we noted above, all evaluations of the merits of health programs are conducted at the state and local levels. The dissent points to the statute which provides that the DPA is to determine whether or not a proposed capital expenditure is "consistent with the standards, criteria, or plans developed pursuant to the Public Health Service Act . . . to meet the need for adequate health care facilities in the area covered by the plan or plans so developed." 42 U.S.C. § 1320a-1(b). However, these "standards, criteria or plans" are developed by the states. For example, 42 C.F.R. § 100.107 lists the criteria that must be identified in the agreement between HEW and the states but only to the extent to which the states have actually developed such criteria.
 
 
 41
 Additional support for this reading comes from the legislative history of the National Health Planning and Resources Development Act of 1974, 42 U.S.C. §§ 300k-300t (1976), which followed the enactment of Section 1122. The Senate Report states:
 
 
 42
 In 1972 the role of State CHP agencies was strengthened by the Social Security Amendments of 1972 (P.L. 92-603). These amendments added section 1122 to the Social Security Act. It provides that health care facilities and HMOs would not be reimbursed by Medicare, Medicaid, or the maternal and child health programs for depreciation, interest or return on equity capital relating to capital expenditures that were determined by designated State planning agencies (which in most States is the 314(a) agency) to be inconsistent with standards, criteria or plans developed by the State agencies. This important provision related to expenditures under Medicare and Medicaid to State health planning for the first time by assuring, in effect, that Medicare and Medicaid would not support the construction of unneeded health care facilities. It was clear in the legislative history of this provision that States should use recommendations from areawide agencies to assist them in the implementation of this provision.
 
 
 43
 S.Rep.No.1285, 93d Cong., 2d Sess. 7, reprinted in (1974) U.S.Code Cong. & Admin.News, pp. 7842, 7848 (emphasis supplied).
 
 
 44
 For these reasons, we remain convinced that the DPA's approval of a capital expenditure is unreviewable under Section 1122.
 
 
 45
 The result we reach on this issue does not, under this statutory framework, totally foreclose consumer participation and input in local health planning and funding. Section 1122(b) requires that every DPA have "a governing body or advisory board at least half of whose members represent consumer interests." In this case three of the individual plaintiffs participated, along with consumers and other opponents of Plan Omega, in several public hearings held by the Interim Council during the initial review period.
 
 V. Constitutional Claims
 
 46
 The appellant's final challenge concerns Section 1122(b)(3) which provides in relevant part:
 
 
 47
 (b) The Secretary . . . shall make an agreement with any State which is able and willing to do so under which a designated planning agency . . . will
 
 
 48
 (3) establish and maintain procedures pursuant to which a person proposing any such capital expenditure may appeal a recommendation by the (DPA) and will be granted an opportunity for a fair hearing . . . .
 
 
 49
 Participating states are required to establish procedures by which adverse decisions of the DPA may be appealed by proponents of capital expenditures. See Section 1122(d)(1)(B)(ii), 42 U.S.C. § 1320a-1(d)(1)(B)(ii). It does not require, however, the establishment of such appeal procedures for opponents of proposals that have been approved.
 
 
 50
 Specifically, the appellants claim that the Secretary's failure to accord opponents of a proposed capital expenditure the same appeal rights as proponents constitutes a violation of their right to equal protection as guaranteed by the due process clause of the fifth amendment. The same claim is made against the director of the BCHP under the equal protection clause of the fourteenth amendment.
 
 
 51
 The parties agree that the classification here does not impinge upon any "fundamental interest" or affect any "suspect class." The test of constitutionality, therefore, is whether the classification bears a rational relation to a legitimate state interest. Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 489, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 513 (1977). As the Supreme Court has noted, the inquiry under the rational relationship standard involves "a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). On these facts, we hold that the distinction drawn between the hearing rights of proponents and opponents of capital expenditures is rationally related to a legitimate governmental interest served by Section 1122.
 
 
 52
 As we noted above, Section 1122 is a program designed to curb unnecessary capital expenditures by hospitals and other health care facilities. Hospitals are required to secure advance approval from state health care planning agencies for capital expenditures in order to be reimbursed with federal funds. Thus, a finding that a proposed capital expenditure is inconsistent with state plans and needs could jeopardize the commencement and completion of health care projects. The provider would arguably be entitled to a hearing before the termination of such reimbursements. In contrast, the interests of opponents of proposed capital expenditures are so distinct that the specter of unconstitutionality is not raised.
 
 
 53
 The Section 1122 review process is designed to be a streamlined procedure and thus avoid delaying the construction of needed facilities. Thus, Congress devised a process in Section 1122(f) to preclude both judicial and administrative review. Moreover, the DPA is required to complete its review of an application within sixty to ninety days of receiving it and, if the DPA fails to render its decision within the allotted time, the application is deemed approved for Section 1122 purposes. 42 C.F.R. § 100.106(a)(4).
 
 
 54
 Providing a proponent whose capital expenditure has been disapproved a fair hearing does not conflict with this clear objective for streamlined proceedings, because there has already been a finding that the proposed capital expenditure is unnecessary. Providing a fair hearing to opponents of a proposed capital expenditure, however, would make this objective unreachable, for any number of opponents could seek a hearing on any number of grounds, with the result that a capital expenditure found to be necessary could be delayed indefinitely. The objective of having streamlined proceedings and thus not delaying indefinitely the construction of needed health care facilities therefore provides a rational basis for the statutory classification.
 
 VI.
 
 55
 In ruling adversely to the plaintiffs, we are not unmindful of the plight that particularly the weak and the poor so often endure as part of their daily lives in many urban communities. Often with well-meaning intentions the services essential to the well-being of urban dwellers are modified or reduced under the claim that in some way the overall community benefits by plans which may further dilute the relatively few options in the inner city. When these options for the inner city are reduced by moving major centers or services to the suburbs, many will applaud and call the transition "progress," while those left behind who bear the greatest brunt of the change may condemn the plan as a retreat from any commitment to improve their quality of life. These are tough policy questions which reveal much about the values of a society. In dealing with these tensions and judgments we must be mindful that we sit as a judicial and not a legislative body. After reviewing most carefully the rights assured by the relevant legislative and constitutional provisions, we must conclude that under the current state of the law, as to the issues raised in this suit, the plaintiffs are remediless.
 
 
 56
 For the foregoing reasons, the judgment of the district court will be affirmed. Each party shall bear its own costs.
 
 
 57
 ADAMS, Circuit Judge, concurring in part and dissenting in part.
 
 
 58
 We examine in this appeal one of the programs designed by Congress to control the rapid inflation nationwide in the cost of health care. Congress did not choose to tackle this problem by direct regulation or by expanding the federal bureaucracy. Instead, it selected a more oblique method that would encourage and strengthen existing local and statewide health planning units and in some cases prompt their creation. The intricate network thereby established was one of many experiments in cooperative federal, state, and local endeavors spawned by HEW.
 
 
 59
 Health planning was originally organized by the hospital industry as a means of limiting the supply of hospital beds in a period of declining revenue during the Depression. The first national attempt to create governmental planning units and to introduce the viewpoint of the consumer was the Comprehensive Health Planning and Public Health Services Amendments of 1966.[1] Federal funds under this act were granted to local and statewide planning agencies that created advisory councils. The legislation required that a majority of the members of the councils affiliated with the planning agencies had to represent consumers.
 
 
 60
 The statute on which this case focuses, and which is referred to as § 1122, was enacted in 1972.[2] Dissatisfaction with existing efforts led Congress to pass the National Health Planning and Resources Development Act of 1974,[3] which, inter alia, was designed to strengthen even further the role of consumers in health planning and to provide more specific goals for this effort.[4]
 
 
 61
 Section 1122 evinces a legislative attempt to avoid indirect subsidization through reimbursement for medical services under various federal programs of unnecessary capital expenditures in the health care field. Unless a hospital or other provider obtains a § 1122 approval of its plan prior to undertaking a major expenditure, it will not be reimbursed for that portion of any medicaid, medicare or other charge payable by the federal government which is attributable to the nonapproved capital expenditure.
 
 
 62
 In accordance with the statutory schema, under which the substantive decision as to approval or disapproval of a hospital's proposal is made by a state designated planning agency (DPA),[5] Delaware's DPA consulted two subagencies. One, the Interim State Comprehensive Health Planning Council, is statewide; the other, the Health Planning Council, Inc., is local. Both of the subagencies recommended approval of the plan put forth by the Wilmington Medical Center to relocate most of its services from the downtown area of the city to the suburbs. Thereupon, it is alleged, the DPA certified its approval of the proposal to HEW without making independent findings.
 
 
 63
 The question addressed here is whether any judicial review is to be available when consumers of health care, primarily those of limited means, allege that the health planning system established by Congress has not worked properly and that federal law has been violated. Although I agree with the majority's conclusion that review of claims against HEW is statutorily barred, I cannot concur in part IV of the majority's opinion, which holds that jurisdiction over the DPA is precluded, nor can I agree with the overall conclusion of the majority that the plaintiffs here are remediless.
 
 
 64
 Plaintiffs, in this action for declaratory and injunctive relief, alleged federal jurisdiction under 28 U.S.C. § 1331 (1976).[6] They claimed injury caused by the defendants' violation of federal law. In considering whether relief may be afforded to them, a court should be guided by the general proposition that federal tribunals have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[7] The specific task here, then, is to ascertain whether Congress has foreclosed jurisdiction by the federal judiciary when an action has been asserted against the DPA.
 
 
 65
 In concluding that there is no jurisdiction to consider the complaint here, which has been asserted by consumers of hospital services in the Wilmington area, the majority relies solely on congressional intent in enacting § 1122(f). Inasmuch as the foreclosure of judicial review in § 1122(f) is textually limited to "a determination by the Secretary," a claim by the plaintiffs should not be cut off unless a fair construction of subsection (f) equates action by the DPA with "a determination by the Secretary." The majority candidly acknowledges that the statute " 'does not expressly preclude judicial review of DPA approvals (of capital expenditures),' " but maintains, as did the district court, that " 'nonreviewability may be inferred from (the) statute's purpose and its legislative history.' "[8]
 
 
 66
 Yet, according to the governing principles conceded by the majority, it is " 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent' that the courts should restrict access to judicial review."[9] The meager legislative history applicable to § 1122 does not yield such "clear and convincing evidence."[10] Thus, that section cannot sustain the majority's conclusion in this regard.
 
 
 67
 This Court has already demarcated the respective roles of the DPA and the Secretary. We have said that the state agency has a substantive duty "to assess any capital expenditure . . . to determine if (it) is consistent with the state's need for adequate health care in the area."[11] And we have also made clear that the Secretary, on the other hand, "has mere ministerial duties"[12] i. e., he has no discretion to review the DPA's substantive assessment, and may examine only the procedures employed to ensure that all the correct steps were taken.[13]
 
 
 68
 Here, the DPA is a state agency,[14] while HEW is, of course, a federal department. It is the obligation of the DPA to evaluate the proposed capital expenditure to ensure conformity with local needs as set forth in the area or statewide plan a plan that must be consonant with federal statutory and regulatory guidelines. In contrast, the Secretary is simply to ensure that the statutory procedures are followed. Given this legislative arrangement, it is difficult to perceive how substantive action by the state agency may be considered part of the "determination by the Secretary."
 
 
 69
 The majority would "federalize" the DPA, for purposes of foreclosing judicial review, by finding that decisions of the state agency come within the statutory preclusion of a "determination by the Secretary." Nonetheless, according to the majority, the DPA is an autonomous state agency, and the planning encouraged by § 1122 is local and not part of a federal program. Confusion regarding this matter may be attributable to the fact that although there is a bright-line distinction between the substantive decisions to be made by the DPA and the assurance of correct procedures which is the responsibility of the Secretary, the federal-state separation in the statue as a whole is not so clear. Moreover, the absence of a rigid separation seems to have been intentional, inasmuch as the DPA is to be guided in its substantive decision by a mixture of federal and local elements. General federal standards and goals are to be given more specific content in an area plan informed by local assessments of need.[15]
 
 
 70
 Following the reasoning of the district court, which was based primarily on Supreme Court decisions interpreting the Administrative Procedure Act,[16] the majority bars federal judicial review of the DPA because it discerns a statutory intent to eschew federal interference in state health planning. But if, as is apparent in the statute, there is federal law to apply to the DPA, it is Congress that has intruded into state health planning, not the plaintiffs' invocation of judicial review. The majority relies in its conclusion on two passages from the limited legislative history purportedly addressing this issue.
 
 
 71
 First, reference is made to the fact that the House Committee stated in its report that the bill "would in no way change the autonomy or authority of existing state or local planning agencies."[17] But as I understand this assertion, it simply means that the federal government was not attempting to preempt the field of health planning or to abolish existing state efforts. Congress decidedly did not intend that there would be no federal control over the DPAs. By enunciating mandatory terms for the agreements between HEW and the states with regard to the DPAs. Congress established certain guidelines to govern the variables left to the states. It provided that at least half the membership of the DPA was to represent "consumers of health services";[18] procedures for notice and review of capital expenditures as well as hearings in some instances were specified;[19] certain other agencies were to be consulted;[20] and the standards, criteria, or plans used by the DPAs to evaluate capital expenditures were to be congruent with those statutorily established in previous legislation.[21] In short, Congress promulgated rules as to the composition, procedures, and standards for decisionmaking by the DPAs.[22] These congressional commands, and not judicial review to enforce them, limit the "autonomy or authority" of the existing agencies. The DPAs, moreover, need not in all cases be state or local government agencies, but may also be private nonprofit organizations.[23]
 
 
 72
 The majority's second reference to legislative history is the observation that each paragraph of the House Report that discusses § 1122 is entitled, "Limitation on Federal Participation for Capital Expenditures."[24] The body of the relevant sections, however, makes clear that the heading refers to Congress's intention to limit the use of federal money; the commentary is not aimed at limiting the federal role in health planning. Indeed, this interpretation of the congressional intent is explicit in the statute itself, which declares:
 
 
 73
 The purpose of this section is to assure that Federal funds appropriated under (various programs) are not used to support unnecessary capital expenditures made by or on behalf of health care facilities or health maintenance organizations which are reimbursed under any of such (programs) and that, to the extent possible, reimbursement under such (programs) shall support planning activities with respect to health services and facilities in the various States.[25]
 
 
 74
 Congress did not want providers of health care, such as hospitals, to be subsidized through federally financed programs for unnecessary capital expenditures. To achieve this aim, Congress created a national health planning program and set national goals and criteria.[26] It was contemplated that this experiment in national health planning would draw on preexisting state and local agencies to the extent possible, and would leave to those agencies the determination whether specific projects met local needs. Detailed decisions were to be left to the DPAs, but the process to be employed in reaching the decisions and the criteria to guide the DPA in arriving at its conclusions were set by Congress and HEW, and are to be applied nationwide.
 
 
 75
 As the district court observed, "The regulations and the agreement between HEW and Delaware pursuant to § 1122 recognize that judicial review may be available under State law or regulation to a proponent (such as a hospital) of an expenditure disapproved by the DPA."[27] This was thought to be irrelevant to the plaintiffs' contention that the federal court has jurisdiction, because, the judge stated, (1) the existence of judicial review for a proponent of a capital expenditure does not indicate an intention to provide it for an opponent, and (2) review by state courts would be consistent with the purposes of § 1122, whereas review by the federal courts would not.
 
 
 76
 The first reason appears to confuse the question whether judicial review is precluded with the equal protection issue (an issue discussed in the majority opinion at 120-121) as to a "fair hearing" within the DPA for an aggrieved proponent of a capital expenditure. It is one thing to hold, as the Court today does, that Congress may provide administrative hearings for proponents but not opponents of a capital expenditure by a medical facility. It is quite another to say, in attempting to discern congressional intent, that a DPA decision adverse to a proponent is not a "determination by the Secretary" for purposes of foreclosing judicial review, but a decision adverse to consumers is such a precluded determination.[28]
 
 
 77
 The second reason adduced by the district court appears to obscure the distinction between procedures, on the one hand, and substantive principles for planning, on the other. Yet, this important difference was carefully etched by Congress and HEW and was incorporated into the agreement between HEW and the state; the state agency is to apply federal procedures and guidelines to a local situation. The plaintiffs allege that the DPA violated federally established procedures and guidelines. Moreover, adjudication on the merits, if the Court were to reach the merits, would require interpretation of federal law, which is within the special competence of the federal courts.[29]
 
 
 78
 Both the district court and the majority on this appeal, perceive the issue of judicial review as a federalism conflict. The statutory arrangement establishing a functional division of labor, in which state or local entities make decisions according to federal law, is thus unnecessarily interpreted so as to draw rigid lines in this program between what is federal and what is state.
 
 
 79
 Congress's intent in the one sentence of § 1122, which was part of a much larger legislative enactment, is admittedly not clear. Doubts, however, are to be resolved in favor of jurisdiction, for, as the Supreme Court has declared, the intention to foreclose review must be "clear and convincing." Because I believe that neither the language of § 1122(f) nor the ascertainable congressional purpose precludes jurisdiction to adjudicate a federal cause of action brought against the DPA, I would reverse the order of the district court on this issue. In all other respects, however, I concur with the majority.
 
 
 
 [1]
 Public hearings were held on May 3, 4 and 5, 1976. On June 3, 1976, the Health Planning Council, Inc., a local health planning agency responsible for submitting comments on Section 1122 applications, recommended that Plan Omega be approved. On June 15, 1976, the Interim State Comprehensive Health Planning Council found that Plan Omega was consistent with the applicable state health plans. The DPA's Advisory Council voted to approve Plan Omega, and subsequently the DPA announced its finding that Plan Omega was consistent with the applicable state health plans. On June 16, 1976, the DPA informed WMC of this finding. Wilmington United Neighborhoods thereafter requested information concerning its right to appeal the DPA's findings; the request for a hearing was denied
 
 
 [2]
 The regulations define a "capital expenditure" as:
 an expenditure . . . which, under generally accepted accounting principles, is not properly chargeable as an expense of operation and maintenance and which (i) exceeds $100,000, or (ii) changes the bed capacity of the facility with respect to which such expenditure is made, or (iii) substantially changes the services of th(at) facility . . .
 
 
 [42]
 C.F.R. § 100.103(a)(1)
 
 
 [3]
 The DPA has discretion to exempt from review changes involving only costs. 42 C.F.R. § 100.103(2)(v)
 
 
 [4]
 Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 151-152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1960); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)
 
 
 [5]
 Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. at 153, 90 S.Ct. at 829-30. See also, Warth v. Seldin, 422 U.S. 490, 498, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)
 
 
 [6]
 The appellees argue that there is no substantial likelihood that WMC will be deterred from proceeding with the completion of Plan Omega by reason of the vacating of the DPA's approval. However, in WMC v. Califano, WMC alleged that the termination of the Section 1122 approval exposes WMC to the risk of loss of reimbursement of capital expenditures from federal funds, and absent such reimbursement, the proposal is not financially feasible. Complaint PP 27 and 28
 
 
 [7]
 WUN's second amended complaint P 3
 
 
 [8]
 The full text of the letter is as follows:
 My valued associate, Joe Dallas, asked my advice on how best to place his letter before you. I agreed to send it to you, and I add my plea that you give it your attention. Its subject is of serious concern.
 Joseph A. Dallas is Chairman of the Board of WMC. His letter which recited the history of Plan Omega from the August 6, 1976 approval by HEW through the request for reconsideration, concluded:
 The reconsideration, though it is factually mistaken and appears to misconstrue the Section 1122 regulations, stands as a severe threat to the financing of Plan Omega; and should a new Section 1122 approval be required, many months of further delay will result at enormous and unwarranted costs to our community.
 I write to ask your intervention in this unfortunate, tangled matter, with the hope that you will be able to rectify the error of the Acting Director's reconsideration, and permit us to proceed with Plan Omega upon which the future capability of WMC to continue the delivery of health care so importantly depends.
 
 
 [1]
 Pub.L.No.89-749, 80 Stat. 1180 (1966) (codified at 42 U.S.C. § 246 (1976))
 
 
 [2]
 Social Security Amendments of 1972, § 1122, Pub.L.No.92-603, 86 Stat. 1386 (codified at 42 U.S.C. § 1320a-1 (1976))
 
 
 [3]
 Pub.L.No.93-641, 88 Stat. 2225 (1975) (codified at 42 U.S.C. §§ 300k-300t (1976))
 
 
 [4]
 For a history and critique of health planning, see Rosenblatt, Health Care Reform and Administrative Law: A Structural Approach, 88 Yale L.J. 243, 304-30 (1978)
 
 
 [5]
 For convenience, DPA, which stands for designated planning agency, refers to the two state defendants in this action: Amos Burke as director of the Delaware Bureau of Comprehensive Health Planning (the actual DPA here), and Robert Sweeney as head of the Interim State Comprehensive Health Planning Council, whose recommendation, it is alleged, was adopted by Burke
 
 
 [6]
 The complaint also alleged jurisdiction under 28 U.S.C. § 1361 (1976), which grants "jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Although this jurisdictional grant might apply to HEW and its officials, it cannot reach the DPA, a state agency, or its officials. See the district court's opinion, 458 F.Supp. at 628, 640 n.57 (D.Del.1978)
 
 
 [7]
 Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); See England v. Louisiana St. Bd. Med. Examiners, 375 U.S. 411, 415, 84 S.Ct. 461, 464-65, 11 L.Ed.2d 440 (1964) (quoting Willcox v. Consolidated Gas Co., 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909)) ("When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.") The constitutional structure of our government may, of course, weigh heavily in favor of delaying federal judicial jurisdiction for, e. g., exhaustion of state or administrative remedies. But what is at stake in this case is not a delay of jurisdiction because of deferral to another branch of the government or to the state on the possibility that a dispute may be settled on nonfederal or nonconstitutional grounds, but whether or not any judicial relief at all may be had for the alleged wrongs
 
 
 [8]
 Majority opinion at 119 (quoting district court opinion, 458 F.Supp. at 628)
 
 
 [9]
 Barlow v. Collins, 397 U.S. 159, 166-67, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140-41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)), quoted in majority opinion at 118
 
 
 [10]
 The entire legislative history addressing subsection (f) alone consists only of one sentence paraphrasing the statute. The section as a whole is not given much more extensive explanation, and that given is not especially instructive as to the judicial review issue. See pp. 115-116 & note 24 infra. The subsequent legislative history on the section as a whole, relied upon by the majority opinion at 119, seems to me to be simply a reiteration of the point that the nationwide health planning envisioned by Congress was an experiment in cooperative federalism neither exclusively state nor federal. As such, it lends no illumination to the question whether § 1122(f) was intended to cut off review of DPA decisions
 
 
 [11]
 NAACP v. Medical Center, Inc., 584 F.2d 619, 628 (3rd Cir. 1978)
 
 
 [12]
 Id
 
 
 [13]
 This Court stated:
 Our understanding of § 1122 is in accord with that of the Secretary and in accord with the perceptions of the district court as well. "If (a § 1122) application has received complete approval when it reaches the Secretary, he then performs the ministerial act of assuring that the proper procedure has been followed. . . . The Secretary, however, has no discretion as to whether the proposed expenditures are unwise. . . .
 We agree with the district court's holding that H.E.W. lacks discretionary power to override the decision of the designated state agency once the state agency has approved, by proper procedure, a capital expenditure proposal. We therefore conclude that the Secretary has mere ministerial duties in a state approved § 1122 application."
 Id. (quoting from the district court opinion, 436 F.Supp. 1194, 1198 (D.Del.1978)).
 
 
 [14]
 Under the statute and HEW regulations, the DPA may be a state agency, "a public or nonprofit private agency or organization" responsible for regional, metropolitan, or local health planning, or such other public or nonprofit private agency found by the state agency to be performing similar functions. 42 C.F.R. § 100.105 (1978); see 42 U.S.C. § 1320a-1(d)(1)(B)(ii)(I) (1976)
 
 
 [15]
 As an example, take the acquisition of computerized axial tomography body ("CAT") scanners. The federally set goal would be to avoid subsidization of unnecessary equipment. In formulating its local plan, a DPA would have to define community needs more specifically e. g., in terms of one CAT scanner per X number of ascertainable patient use hours, X amount of population, or X miles of radius
 
 
 [16]
 See 458 F.Supp. at 640-41 & n.57 (relying on Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); and 5 U.S.C. § 701(b)(1) (1976))
 
 
 [17]
 H.R.Rep.No.231, 92d Cong., 2d Sess., reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 4989, 5066 (quoted in majority op. at 13)
 
 
 [18]
 42 U.S.C. § 1320a-1(b) (1976)
 
 
 [19]
 Id. § 1320a-1(b)(1), (3); see 42 C.F.R. § 100.106 (1978) prescribing, pursuant to the statute, more detailed provisions on notice and procedure that must be in the agreements between HEW and state governors)
 
 
 [20]
 42 U.S.C. § 1320a-1(b)(2) (1976)
 
 
 [21]
 The DPA is to determine whether or not a proposed capital expenditure is "consistent with the standards, criteria, or plans developed pursuant to the Public Health Service Act . . . to meet the need for adequate health care facilities in the area covered by the plan or plans so developed." Id. § 1320a-1(b)
 
 
 [22]
 Congress also provided for federal reimbursement to the DPA for expenses incurred in its § 1122 review. 42 U.S.C. § 1320a-1(c) (1976)
 
 
 [23]
 See note 14 supra
 
 
 [24]
 H.R.Rep.No.231, supra note 17, at 5004, 5065, 5288 (quoted in majority op. at 17). The only specific reference to subsection (f) in the entire House report is one sentence that simply paraphrases the language of the statute. Id. at 5290
 
 
 [25]
 Social Security Amendments of 1972, Pub.L.No.92-603, § 1122(a), 86 Stat. 1386 (codified at 42 U.S.C. § 1320a-1(a) (1976)). As this Court has observed, the statute has a dual purpose: "containment of hospital costs" and "encouragement of rational health planning by the states." NAACP v. Medical Center, Inc., 584 F.2d 619, 627 (3d Cir. 1978)
 
 
 [26]
 See generally Rosenblatt, supra note 4, at 304-07 (1978) (discussing evolution of congressional concerns in health planning efforts enacted prior as well as subsequent to the enactment of § 1122)
 
 
 [27]
 458 F.Supp. at 641 (citing 42 C.F.R. § 100.106(c)(4) (1978))
 
 
 [28]
 Such reasoning does not comport with the language of the statute, for, as this Court has previously noted, the statute is silent as to what the Secretary does if a project is approved by the DPA. See NAACP v. Medical Center, Inc., 584 F.2d 619, 628 & n.13 (3d Cir. 1978). It could therefore be argued that when approval is granted, nothing is within the preclusion-of-review reach of § 1122(f). The majority concludes that the DPA's approval of the Medical Center's proposal, and the Secretary's determination that the approval was procedurally sound, may not be reviewed because of § 1122(f)'s reference to a determination by the Secretary under that section. Yet the only determination by the Secretary mentioned in § 1122 is a determination by the Secretary when a proposed expenditure has not been approved by the DPA
 The sole reference to the meaning of "a determination by the Secretary under (§ 1122)" is subsection (d), which is headed "Determination of amount of exclusions from Federal payments." A roadmap to that complex provision would read as follows: (1) If the Secretary determines that (A) the DPA was not given notice of a proposed capital expenditure or (B) the DPA was given notice and (i) has notified the proponent within a reasonable time that the expenditure is not approved, and (ii) has, prior to that decision (I) consulted with certain other agencies and (II) granted the provider an opportunity for a hearing, then the Secretary shall exclude from federal reimbursement any costs attributable to that expenditure. (2) Despite the DPA's disapproval, the Secretary may still reimburse the provider if the Secretary submits the matter to a national "advisory council" and that council demonstrates the virtue of the expenditure. See 42 U.S.C. § 1320a-1(d) (1976).
 Nothing in § 1122 refers to any procedure of the Secretary when the DPA approves the capital expenditure. The facts of this case, therefore, are totally outside the clear meaning of § 1122(f)'s preclusion of administrative or judicial review. As a subsidiary point, this analysis of the core of § 1122 underscores Congress's exclusive focus in the statute on the means for saving federal money.
 
 
 [29]
 At least one of the contentions of the plaintiffs is purely a matter of interpreting the federal statute. Contrary to the majority's assertion that the Secretary determined that no new § 1122 review was required after the Medical Center altered its plan to comply with the finding of the Office of Civil Rights, see majority opinion at 119, the letter of Dr. Margulies as Acting Administrator of HEW's Health Resources Administration simply asserted that "(t)he decision whether an expenditure warrants DPA review . . . is in the first instance one for the DPA." The definition of a "capital expenditure," though, is set by the statute. 42 U.S.C. § 1320a-1(g) (1976). It is questionable, therefore, whether HEW could give the DPA discretion to exempt from review, as it seems to have done in 42 C.F.R. § 100.103(a)(2)(v) (1978), a capital expenditure that meets the statutory definition
 I do not suggest that federal jurisdiction on this matter should be exclusive. Indeed, state courts have adjudicated challenges by providers to DPA decisions. See North Miami Gen. Hosp., Inc. v. Office of Community Medical Facilities, Dept. of Health & Rehabilitative Servs., 355 So.2d 1272 (Fla.App.1978); Charter Med. Corp. v. Mississippi Health Planning & Dev. Corp., 362 So.2d 180 (Miss.1978). But cf. Lakeside Mercy Hosp. v. Indiana St. Bd. Health, 421 F.Supp. 193, 198 (N.D.Ind.1976) (reviewing DPA decision; citing dismissal of action by state court on grounds that it could not review action of DPA "where, as here, it was acting as an agency of the federal government").