COLE, Judge.
On August 7,1984, Rapides General Hospital, the plaintiff, brought suit against Sandra Robinson, Secretary Department of Health and Human Resources and Harvey Fitzgerald, Undersecretary, Department of Health and Human Resources, the defendants herein. The plaintiff sought an order commanding the defendants to comply with an agreement entered into between the Secretary of the U.S. Department of Health and Human Services and the State of Louisiana, known as a Section 1122 agreement. Further, the plaintiff sought to restrain the defendants from complying with any orders from Governor Edwin W. Edwards that attempt to change the existing 1122 program, including Executive Order EWE 84-13, the moratorium on 1122 application approvals. In addition, the plaintiff sought an order recalling and vacating the 1122 approval granted to the Pineville Regional Medical Center.
A temporary restraining order was issued by the trial court granting the relief sought by the plaintiff and requiring the defendants to show cause on September 7, 1984 why the temporary order should not be made permanent. On August 9, 1984, an intervention was granted to the Lafayette General Hospital which, in addition to the relief sought by the initial plaintiff, sought an order recalling and vacating the 1122 approval granted to the Lafayette Regional Medical Center. An additional tem *713 porary restraining order and show cause order as to the relief sought by the inter-venor was granted by the trial court.
On August 9, 1984, the defendants filed a motion to vacate the stay orders and a hearing on the motion was held.[1] The next day the trial court rendered judgment dismissing the plaintiffs and intervenor’s suits. As a basis the trial court found they possessed “no right and/or cause” of action pursuant to the rationale expressed by the court in Lifemark Corp. v. Guissinger, 416 So.2d 1279 (La.1982). The trial court also decreed all stay orders previously issued were recalled, vacated and set aside. The plaintiffs then sought supervisory writs which were denied by this court and thereafter by the Supreme Court. The plaintiffs now bring this devolutive appeal.
The statutory and regulatory background of Section 1122 of the Social Security Act has been well documented. The court in Psychiatric Institutes of America, Inc. v. Heckler, 596 F.Supp. 1311 (E.D.La. 1984), provides,
“Prior to 1972, the Department of Health, Education and Welfare, now the Secretary, reimbursed hospitals and other health care facilities for the cost of providing service to Medicare, Medicaid and other federal beneficiaries. The amounts which were reimbursed included the costs attributable to building and equipping those facilities. In 1972, to assure that federal assistance for capital expenditures was not used to support unnecessary capital expenditures and to assure that federal reimbursements for capital expenditures were consistent with state plans, Congress enacted Section 1122 of the Social Security Act, 42 U.S.C. §§ 1320a-l et seq.2
Section 1122 provides that interested states may enter into an agreement with the Secretary whereby the State agrees to review certain capital expenditures proposed by or on behalf of health care facilities located within the State. This review is made under the auspices of a state designated planning agency (DPA). The Secretary has entered into such an agreement with the State of Louisiana.”at 1313. [Footnote omitted.]
The subject agreement between the Secretary (U.S.) and the State of Louisiana was renewed to become effective on July 1, 1984.
I.
EXECUTIVE ORDER EWE 84-13
On July 30, 1984, in a letter to Mr. Harvey J. Fitzgerald, Undersecretary of the Department of Health and Human Resources, Governor Edwin W. Edwards stated, “Effective August 1, 1984, and for an indefinite period of time, I am ordering the implementation of a moratorium on the 1122 Program.” Thereafter, on August 1, 1984, Governor Edwards signed and affixed the Great Seal of the State of Louisiana to Executive Order EWE 84-13.[2]
It is the contention of the plaintiffs this executive order is ultra vires for two specific reasons. First, they argue nowhere in the agreement between the State of Louisiana and the Federal Department of Health and Human Services does a provision allow for a moratorium or a “breach” of the contractual obligations which the agreement provides. Second, they argue because the executive order directs, “No application for any type health care facility or service under the federal 1122 Program shall be approved for an indefinite period of time..,” it disregards properly promulgated rules of the Louisiana Department of Health and Human Resources, Division of Policy Planning and Evaluation, which serves as the Designated Planning Agency for the State of Louisiana. Therefore, the plaintiffs contend an executive order in this context is a “rulemaking” which must comply with the Louisiana Administrative Procedure Act, La.R.S. 49:951 et seq., which they allege it clearly does not. •
*714 In determining whether the governor possesses the power to declare a moratorium in this instance and whether that power must be exercised through the channelized provisions of the LAPA we note initially the court in Lifemark Corp. v. Guissinger, supra, stated, “We expressly decline to address at this time the issue of the applicability of the Administrative Procedure Act to the Section 1122 process.” — p. 1282, fn 8.
The enabling statute empowering the federal secretary to enter into a 1122 agreement with a state, 42 U.S.C. § 1320a-1(b), provides in pertinent part:
“The Secretary, after consultation with the Governor (or other chief executive officer) and with appropriate local public officials, shall make an agreement with any State which is able and willing to do so-” (Emphasis ours.)[3]
In conjunction with the above statute the record establishes it is the continuing practice of the State of Louisiana to have the office of the Governor, through its Department of Health and Human Resources, to maintain yearly the 1122 agreement.[4]
The executive authority of the Governor emanates from Article IV, Section 5(A), Louisiana Constitution of 1974, which provides:
“The governor shall be the chief executive officer of the state. He shall faithfully support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed.”
It is the exercise of this executive authority which forms an 1122 agreement. In an analogous context it has been recognized in Harris v. Trustees of La. Public Facilities, 356 So.2d 1039 (La.App. 1st Cir. 1977), writ denied, 357 So.2d 558 (La.1978), the acceptance by the governor of the beneficial interest in a public trust is not a legislative function but is a ministerial function which is properly exercised by the governor.
In Durrett Hardware & Furniture Company v. City of Monroe, 199 La. 329, 340, 5 So.2d 911, 915 (1942), our Supreme Court states,
“Under our system of government providing for a distribution of powers between the legislative, executive and judicial departments, it is of vital importance that no one department unduly interfere with or hinder any other department while the latter is acting or assuming to act within the scope of the particular powers reserved to it.”
We have determined it is the duty of the office of the governor to oversee the 1122 program. Therefore, if the governor, through an executive order, places a moratorium on the 1122 agreement indicating the State of Louisiana is no longer “willing to do so ...,” the order may not be set aside by a coordinate branch of our state government.
Because the decision to order a moratorium suspending the contractual obligations of the State of Louisiana with the United States Secretary of Health is not subject to limitation or control from the other government branches, no judicial review can be obtained.[5] Specifically, it is a well recognized principle of law a statute such as the *715 LAPA can not adversely affect authority granted pursuant to our state constitution. See La. Consumers’ League, Inc. v. La. Public Serv., 351 So.2d 128, 131 (La.1977), wherein it was held: “This constitutional grant of rule-making power to the Commission precludes the legislature from enacting statutes which would restrict the Commission’s ability to adopt its own rules, regulations, and procedures. Accordingly, the rule-making provisions of the Administrative Procedure Act are not applicable to the Commission.” Surely, the constitutional grant of power to our Governor must be of comparable significance.[6]
II.
JUDICIAL REVIEW OF APPROVED APPLICATIONS # 5011 and # 5013
In the same July 30, 1984 letter to Mr. Harvey Fitzgerald which instituted the moratorium, Governor Edwards directed Mr. Fitzgerald to approve eight applications, two of which were # 5011, the Lafayette Nursing Home, and # 5013, the Pine-ville Nursing Home.[7] Subsequently, certificates of approval were granted these eight applications by the Designated Planning Agency (DPA) of the DHHR.
*716 It is the contention of the plaintiffs the grants of the certificates of approval which are the subject matter of this case were invalid for several reasons. The plaintiffs allege judicial review may be sought to discern this invalidity. We note the plaintiffs are opponents of the approved proposals.
In Lifemark when faced with the threshold issue of whether plaintiffs were entitled to oppose a certificate of approval issued to the proponent of the application, NME, the court found:
“Since federal law does not contemplate a procedure for the opponents of proposals that have been approved and Louisiana has not established one, we must conclude that plaintiffs are not entitled to oppose the certificate of approval issued to NME. Therefore, the trial judge erred in recalling and vacating the certificate of approval issued by DPA to NME.” — at 1281.
Thereafter, in Psychiatric Institutes of Am. v. Guissinger, 464 So.2d 7 (La.App. 1st Cir.1984), writs denied, 467 So.2d 530, 534 (La.1985), a three judge panel of this court discussing the appeal taken by an opponent of an approved certificate held,
“It is not clear from Lifemark whether this plaintiff, denied earlier access and now precluded from judicial review, should be given no opportunity at all to express his opposition. We interpret Lifemark to hold that the law does not require the establishment of such appeal procedures for opponents of proposals that have been validly approved. Thus, where the approval is invalid, judicial review is available in state court2 on that narrow procedural issue: whether the DPA and hearing officer followed their own procedures.” —at 11. (Footnote omitted.)
As a basis for requiring judicial review the Psychiatric Institutes of America court points out the following: “In this case, the plaintiff questions his denial of access to discussions of need when regulations, if properly followed, require public hearings guaranteeing equal time to those in favor of and those opposed to an application. Louisiana Register, Yol. 8 at 414, § B.4 (August 20, 1982).” — at 11.
In the present instance the petition of Rapides General Hospital admits, “Plaintiff appeared at the public hearing held on June 19, 1984 in regard to the project listed as No. 5 above.” This is the Pineville Nursing Home application, # 5013, which they are opposing. The petition of Lafayette General Hospital admits, “Plaintiff appeared at the public hearing held on June 19, 1984 in regard to the project listed as No. 8 above.” This is the Lafayette Nursing Home application, #5011, which they are opposing. Therefore, the basis for judicial review which existed in Psychiatric Institutes of America is not present in this case. The plaintiffs in this instance had access to the hearings. However, this court is of the opinion the preclusion set forth by our Supreme Court in Lifemark is an absolute one and exceptions should not be judicially created by this intermediate court.
The Lifemark court noted,
“For example, the DPA is required to complete its review of an application within sixty to ninety days of receiving it and, if the DPA fails to render its decision within the allotted time, the application is deemed approved for Section 1122 purposes. 42 C.F.R. § 100.106(A)(4).”— at 1281, fn 5.
Thus, it is evident the court recognized the DPA did not have to follow any procedural scheme and an application would still be deemed “validly” approved.
Further, to preclude review of only valid approvals is a meaningless act. How might one tell if an approval is valid or invalid prior to review? If preclusion were applied only to valid approvals it would never take place. There is no need to preclude the review of a valid approval. When the court in Lifemark stated “plaintiffs are not entitled to oppose the certificate of approval issued to NME,” the meaning is clear. See Hollingsworth v. Schweiker, 664 F.2d 526 (5th Cir.1981) and Wilmington United Neighborhoods v. *717 United States Department of Health, Education and Welfare, 615 F.2d 112 (3d Cir.1980), cert. denied, 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980); and, compare with Humana Hospital Corp., Inc. v. Blankenbaker, 734 F.2d 328 (7th Cir.1984).
Assuming judicial review is available to the opponents of an approved application for limited purposes, this review may not take place until the exhaustion of all administrative remedies. In Psychiatric Institutes of America, the court finds this point to be reached when the hearing officer has rendered a decision and cites Life-mark for this proposition. The court reasons that being the case all administrative remedies had been exhausted for an opponent of an approved application and judicial review may occur. However, this is arguably an erroneous interpretation of Life-mark. The point when the hearing officer has rendered a decision should only be the exhaustion point for disapproved applicants, not opponents, and this is all Life-mark has determined. An approved applicant must still undergo review by the federal secretary. The process is described in Psychiatric Institutes of America, Inc. v. Heckler, supra, as follows:
“The DPA submits the state’s finding as to whether the proposal is consistent with applicable standards, criteria and plans to the Secretary of HHS. After receiving this finding from the State, the Secretary makes a determination whether to withhold capital-related Medicare and Medicaid reimbursement from the facility. Section 1122(d)(1) requires the Secretary of HHS to withhold Medicare and Medicaid funds from a health care facility if the Secretary determines that either of two circumstances is present: (1) the facility has failed to give notice to the DPA of its intent to incur an obligation for a capital expenditure at least 60 days before incurring that obligation; or (2) the DPA, in accordance with certain procedural requirements, finds that the proposal is inconsistent with the applicable plans, criteria or standards (unless that finding is modified by a state hearing officer or state court).
The authority to make this initial federal determination under Section 1122 has been delegated to the Department’s Regional Health Administrator (RHA). Once the RHA has made its determination, Section 1122(f) gives any person the right to request the Secretary to reconsider the determination of the RHA. The authority to reconsider Section 1122 determinations has been delegated to the Administrator, Health Resources and Services Administration (Administrator). Section 1122(f) precludes further administrative or judicial review after the determination of the RHA is reconsidered by the Administrator. 42 U.S.C. 1320a-1(f).” — at 1314. [Footnote omitted.]
There is a divergence of viewpoint among the federal circuit courts of appeals as to whether the federal secretary is required to review the application for state procedural defects. Compare Humana Hospital Corp., Inc. v. Blankenbaker, supra, mandating review; and, Hollingsworth v. Schweiker, supra, indicating where there are procedural defaults by the state DPA, the problem should be solved in later contract negotiations or by suit to enforce the 1122 agreement. If such a review is required by the federal secretary then administrative remedies have not been exhausted and an opponent of an approved application may not yet seek judicial review. In the present case the record does not indicate whether the federal secretary has concluded his duties.
We determine the trial court was correct in this instance.
DECREE
The judgment of the trial court dismissing this suit is affirmed. Costs of this appeal are to be borne equally by Rapides General Hospital and Lafayette General Hospital.
AFFIRMED.
LOTTINGER, J., concurs.
*718 CRAIN, J., concurs and assigns written reasons.
CARTER, J., concurs for reasons assigned by CRAIN, J.
SAVOIE and LANIER, JJ., dissent.
SHORTESS, J., dissents and assigns reasons.

. This motion was tantamount to the filing of the peremptory exception raising the objections of no right of action and no cause of action.

. The order can be read in the Louisiana Register, Volume 10, Number 9, page 649.

. Although plaintiffs contend no provision in the 1122 agreement allows for a moratorium it can be inferred from "willing to do so ...,” the Governor of a state is provided with discretion. Regardless, the Governor of Louisiana must act in what he regards as the best interests of the state during his interaction with the federal sovereign. The power to allow a moratorium stems from this executive authority. Further, it must be noted the 1122 program was never intended to usurp the power of a state to plan for its health needs, but to augment that power. See Wilmington United Neighborhoods v. U.S., 615 F.2d 112, 120 (3rd Cir.1980).

. It can be argued this state does not have to accede to the requirement that the Secretary consult with the Governor. However, through its practices the legislature has acquiesced in this requirement. In the context of the state budget such an acquiescence has been deemed to be a delegation of power assuming constitutional proportions. See La. Ass’n of Planning & Development v. Treen, 435 So.2d 1003 (La.App. 1st Cir.1983).

. It is clear the Governor’s authority is plenary in certain areas. See Bryant v. Louisiana State Pardon Board, 378 So.2d 180 (La.App. 1st Cir. *715 1979). Arguably, a different result would be in order if the DHHR were an agency under the control of another elected official and not under the Governor’s direct control.

. It is noted in the defendant’s brief,
"It must be further pointed out that hundreds of executive orders have issued without following the Administrative Procedure Act. Neither the Governor nor the legislature ever took any action to indicate that executive orders should follow the procedures of the Administrative Procedure Act. Indeed, Act 687 of 1982 added La.R.S. 49:215 to specifically set forth the procedures to be followed by the Governor under his constitutional authority to see that the laws are faithfully executed. Practically speaking, a decision holding that executive orders must conform to the Administrative Procedure Act will subject all existing executive orders to court challenge.”

. The pertinent text of this letter provides:
"Another issue of extreme concern to me that must be addressed, and is considered a problem, relates to the need of additional nursing home beds. Elected officials and citizens throughout the state have written to me and personally - confronted me with various problems concerning the availability of nursing home beds, high occupancy, waiting lists, long distances to travel to existing nursing homes and various other problems. You and I have discussed these problems on several occasions. In many cases, you informed me that the plan did not show a need. However, these people are frustrated, as their need is apparently greater than the plan allows. If the problems lie within the plan, and I suspect that they do, correct it. Where changes are required in the State Health Plan, assess the impact on state needs and the fiscal impact on the state budget. Contrary to the bed need as determined by the State Health Plan, I find existing needs that are unmet throughout the state, high occupancy rates in existing facilities and hardships that are caused by this.
As Governor, I am using Executive Authority to supersede the State Health Plan and to order you to approve the nursing home applications listed below that are to be located throughout the state. You are to override the findings of the State Health Plan in the review of the following applications and to approve the facilities for reimbursement under the 1122 Program and the Social Security Act. These approvals are to be effective prior to the moratorium scheduled for August 1, 1984.
1. Caddo Nursing Home, Inc. Shreveport, La. # 5064
2. Bossier Nursing Home, Inc., Bossier City, La. #5066
3. Oauchita Nursing Home, Inc., Monroe, La. # 5067
4. Logansport Nursing Home, Logansport, La. # 5075
5. Pineville Nursing Home, Pineville, La. #5013
6. Southfield Care Center, Inc., Lecompte, La. #5056
7. Baton Rouge Total Care Center, Inc., Baton Rouge, La. # 6009
8. Lafayette Nursing Home, Lafayette, La. #5011
I am aware that these applications may have some deficiencies, based upon present program applications, especially when related to bed need in those particular localities. It is that very problem which points to the need for a review of the entire 1122 Program, since I have information from legislator's and other local officials that there is specific need for these facilities in the eight designated areas, notwithstanding that data of a general area may indicate otherwise. Pressures and entreaties from local officials and others in these specific areas weigh heavily in support of approving these facilities, notwithstanding that data for the area in general may indicate otherwise under present 1122 Rules and Regulations and criteria emanating therefrom."